[No. D020372. Fourth Dist., Div. One. May 30, 1996.]

CALIFORNIA TEACHERS ASSOCIATION et al., Plaintiffs and Respondents, v.
GOVERNING BOARD OF SAN DIEGO UNIFIED SCHOOL DISTRICT, Defendants and Appellants.

## COUNSEL

Christina L. Dyer and Melanie Petersen for Defendants and Appellants.

Rosalind D. Wolf, Terri A. Tucker, A. Eugene Huguenin, Jr., Beverly Tucker, Charles R. Gustafson and Robert E. Lindquist for Plaintiffs and Respondents.

## OPINION

**BENKE, Acting P. J.—**

### SUMMARY

This case arises because a school district has adopted a policy which prevents its employees from wearing political buttons at work sites during work hours. Acting on behalf of its members, a teachers' union challenged the policy by way of a petition for a writ of mandate. The trial court found the policy unduly infringed on the teachers' right to free expression and granted the writ. The school board filed a timely notice of appeal.

We find the district has the power to prevent its employees from wearing political buttons in its classrooms and when they are otherwise engaged in providing instruction to the district's students. On the other hand we find the district has no such power when its employees are not engaged in instructional activities.

### I

### FACTUAL AND PROCEDURAL BACKGROUND

By way of an initiative on the November 1993 ballot, California voters were asked to consider a proposal to adopt a voucher system of financing elementary and secondary education. Appellants Governing Board of San Diego Unified School District and Bertha Pendleton, superintendent (collectively district), adopted a resolution, stating the initiative would have a detrimental impact on district's schools. The initiative was also opposed by respondents California Teachers Association and San Diego Teachers Association (collectively SDTA).

Notwithstanding its own opposition to the voucher initiative and in apparent response to the campaigns for and against the proposal, on August 25,

1993, district sent its employees a circular which in part stated: "State law prohibits the public school districts from sponsoring or subsidizing the distribution of partisan campaign materials. District employees may not engage in political or campaign activities during work hours. (Education Code Sections 7050 through 7057.) This restriction includes the wearing or display of partisan political materials (i.e. posters, political buttons) at work sites during work hours."

On August 27, 1993, SDTA objected to the policy. In particular SDTA demanded that "the District immediately rescind its prohibition against employees wearing political buttons, and issue and distribute a statement which clearly states that the employees may wear political buttons while at the work site during working hours." District declined to rescind the policy and SDTA filed a petition for a writ of mandate.

SDTA's petition alleged district's policy improperly restricted the employees' right to express their beliefs as guaranteed by Education Code[1] section 7052, Labor Code section 1101, article I, section 2, subdivision (a) of the California Constitution and the First Amendment to the United States Constitution. In particular the petition alleged that in prior years employees had been allowed to wear political buttons during work hours and that no disruption or interference with instructional activities had occurred. In addition to requesting a writ of mandate, the petition also sought declaratory relief, attorney fees and punitive damages.

District filed an answer to the petition. The answer denied district's policy improperly infringed on its employees' rights. District also filed a memorandum of points and authorities in opposition to the petition in which it argued that it had the right to prevent its schools from being used as a forum for conveying political messages to students.

The trial court granted the writ, stating in part: "The [district's] policy violates the First Amendment in that the restriction on passive speech is not justified by a conclusion, based on reasonable inferences flowing from concrete facts that the interests of discipline or sound education are materially and substantially jeopardized."

District filed a timely notice of appeal.

---

[1] All further statutory references are to the Education Code unless otherwise indicated.

## II

## DISCUSSION

### A. *A School District's Power Over Speech It Sponsors*

■ District's power to regulate the political activities of its employees is found initially in section 7055 which states: "The governing body of each local agency may establish rules and regulations on the following: [¶](a) Officers and employees engaging in political activity during working hours. [¶](b) Political activities on the premises of the local agency." Contrary to SDTA's argument, by its terms section 7055 plainly gives school districts the power to restrict political speech during working hours.[2] (See 77 Ops.Cal.Atty.Gen. 56, 57 (1994).) The Legislature's failure in 1994 to adopt a proposal which would have restricted the political activities of all public employees, including school district employees (see Assem. Bill No. 2624 (1993-1994 Reg. Sess.), introduced Feb. 1, 1994), has very little weight in interpreting the existing provisions of section 7055. (See *Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 923 [16 Cal.Rptr.2d 226, 844 P.2d 545].)

However, the power provided by this statute is not unfettered. Indeed, section 7052 states: "Except as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a local agency." More importantly, under our Constitution "[t]eachers like others, have the right to speak freely and effectively on public questions as well as the 'inseparable' and 'cognate' [citations] 'right . . . to petition the Government for a redress of grievances' [citation]. They do not 'shed' these rights 'at the schoolhouse gate.' " (*L. A. Teachers Union* v. *L. A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 557-558 [78 Cal.Rptr. 723, 455 P.2d 827] (*L.A. Teachers*).) Thus in considering district's policy, "we must strike 'a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " (*Ibid.*, quoting *Pickering* v. *Board of*

---

[2]We also note SDTA alleged district's policy violates Labor Code section 1101, which provides: "No employer shall make, adopt, or enforce any rule, regulation, or policy: [¶](a) Forbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office. [¶](b) Controlling or directing, or tending to control or direct the political activities or affiliation of employees." Because it is narrowly focused on school district employees, the regulation of political activity during working hours authorized by section 7055 controls over the more generally applicable provisions of Labor Code section 1101. (See *Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 21-23 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016].)

*Education* (1968) 391 U.S. 563, 568 [20 L.Ed.2d 811, 817, 88 S.Ct. 1731]; see also *United States* v. *National Treasury Employees Union* (1995) 513 U.S. __ [130 L.Ed.2d 964, 978-981, 115 S.Ct. 1003].)

In striking the appropriate balance, we must first recognize that regulation of student-generated speech presents a question, which is separate from that which arises when a school is asked to itself promote, sponsor or endorse a particular viewpoint. (See *Hazelwood School District* v. *Kuhlmeier* (1988) 484 U.S. 260, 270, 271 [98 L.Ed.2d 592, 604-605, 605-606, 108 S.Ct. 562] (*Kuhlmeier*).) In responding to the former question, the Supreme Court has held a school may regulate a student's expression of his or her viewpoint only upon a showing that such expression "would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.' " (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 509 [21 L.Ed.2d 731, 739, 89 S.Ct. 733].) On the other hand when students or teachers are engaged in speech which members of the public might reasonably perceive to bear the imprimatur of the school, the school has a great deal more authority. (*Kuhlmeier, supra,* 484 U.S. at p. 271 [98 L.Ed.2d at pp. 605-606].) ▮ In particular the Supreme Court has stated that a school retains the authority to refuse to sponsor speech that might reasonably be perceived to "associate the school with any position other than neutrality on matters of political controversy." (*Id.* at p. 272 [98 L.Ed.2d at p. 606].)[3]

Thus, unlike the trial court, we do not believe this case may be resolved solely by considering whether political activities by district employees during working hours materially and substantially jeopardize the interests of discipline or sound education. Rather, as a threshhold matter, we must determine whether and under what circumstances political activity by the district's employees falls within a district's power to dissociate itself from political controversy.

## B. *Classroom Activities*

We first turn to district's power to regulate what is presented by its employees in its classrooms and in other instructional settings. The Supreme Court has consistently recognized the substantial influence and power instructors have over elementary and secondary age students in their classrooms. Thus, in holding that the state may not adopt a curriculum in

---

[3]The authority which the court in *Kuhlmeier* gave schools has been limited in the case of student speech by sections 48907 and 48950. (See *Leeb* v. *DeLong* (1988) 198 Cal.App.3d 47, 54-55 [243 Cal.Rptr. 494]; *Lovell* v. *Poway Unified School District* (9th Cir. 1996) 79 F.3d 1510.) Here however we are not concerned with student speech but with speech by employees of the district. That speech is still governed by sections 7052 through 7057.

elementary or secondary schools which advances the tenets of a particular religion, the court stated: "Students in such institutions are impressionable and their attendance is involuntary. [Citations.] The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. [Citations.]" (*Edwards* v. *Aguillard* (1987) 482 U.S. 578, 584 [96 L.Ed.2d 510, 519, 107 S.Ct. 2573], fn. omitted.)

Importantly, the power and influence of public school teachers cannot be considered in the same light as expressions by students in noninstructional settings. (See *James* v. *Board of Education of Central Dist. No. 1, Etc.* (2d Cir. 1972) 461 F.2d 566, 573 (*James*).) Thus a student-run religious club may conduct its activities on a public school campus because ". . . there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and *no school officials actively participate.*" (*Westside Community Bd. of Ed.* v. *Mergens* (1990) 496 U.S. 226, 251 [110 L.Ed.2d 191, 216, 110 S.Ct. 2356], italics added (*Mergens*).) Similarly, "[t]he potential for undue influence is far less significant with regard to college students who voluntarily enroll in courses. 'This distinction warrants a difference in constitutional results.' [Citation.] Thus, for instance, the Court has not questioned the authority of state colleges and universities to offer courses on religion or theology. [Citation.]" (*Edwards* v. *Aguillard, supra,* 482 U.S. at p. 584, fn. 5 [96 L.Ed.2d at p. 519].)

In addition to its establishment clause jurisprudence, a school district's responsibility for what occurs in curricular settings has also been recognized in the Supreme Court's free-speech cases. In *Bethel School Dist. No. 403* v. *Fraser* (1986) 478 U.S. 675, 683 [92 L.Ed.2d 549, 558-559, 106 S.Ct. 3159] (*Fraser*), the court held that a high school could lawfully discipline a student who, at a mandatory assembly, used a thinly veiled sexual metaphor to describe the attributes of a candidate he was supporting for a student body office. "The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board." (*Ibid.*)

In *Kuhlmeier* a school principal deleted stories from a high school newspaper because he believed one story would disclose the identity of a pregnant student and another one invaded the privacy of a student's family. The court found the principal had the power to delete the stories because the newspaper was published as a part of a journalism class, one of the goals of the class was to give students an understanding of the " 'legal, moral, and

ethical restrictions imposed upon journalists within [a] school community' "
and the deletions were reasonably related to this pedagogical interest.
(*Kuhlmeier, supra*, 484 U.S. at p. 276 [98 L.Ed.2d at p. 608].)

Although they arise in somewhat different factual contexts, our consideration of these cases has led us to some conclusions which bear directly on district's regulation of political expression in instructional settings. Most self-evident is the conclusion that when public school teachers and administrators are teaching students, they act with the imprimatur of the school district which employs them and ultimately with the imprimatur of the state which compels students to attend their classes. (See *Edwards* v. *Aguillard, supra*, 482 U.S. at p. 584 [96 L.Ed.2d at pp. 519-520]; *Mergens, supra*, 496 U.S. at p. 251 [110 L.Ed.2d at p. 216].) Indeed, it is the state's willingness to lend its power and financial support to elementary and secondary education which in fact gives teachers the opportunity and authority to mold young and impressionable minds.

Our first conclusion leads directly to our second. The school's imprimatur is not a distinct or easily isolated portion of a teacher's classroom role. Rather, the considerable resources schools spend in attempting to create trust, obedience and admiration for teachers operate with every instruction, request or question a teacher asks of his or her pupils. (See *Edwards* v. *Aguillard, supra*, 482 U.S. at p. 584 [96 L.Ed.2d at pp. 519-520]; *Roberts* v. *Madigan* (10th Cir. 1990) 921 F.2d 1047, 1053.) In this intimate and deferential environment, public school authorities may reasonably conclude it is not possible to both permit instructors to engage in classroom political advocacy and at the same time successfully dissociate the school from such advocacy. In short the very attributes of a successful teacher/student relationship make it reasonable for school authorities to conclude the only practical means of dissociating a school from political controversy is to prohibit teachers from engaging in political advocacy during instructional activities.

We also believe that wearing a political button is the type of advocacy which a school governing authority may restrict in instructional settings. Although SDTA has attempted to characterize button wearing as passive speech, this characterization ignores the power and influence teachers have within the classroom when they are engaged in teaching elementary and secondary school students. That power and influence give clear and loud voice to any buttons teachers wear while they are so engaged. In this regard we note that restrictions on button wearing have been upheld in other situations where employees have "close personal relationships for which

personal loyalty and confidence are necessary." (*U.S. Dept. of Justice* v. *FLRA* (5th Cir. 1992) 955 F.2d 998, 1006 [border patrol agents may be prohibited from wearing union pins on uniforms]; see also *Smith* v. *United States* (5th Cir. 1974) 502 F.2d 512, 517 [psychologist employed by Veterans' Administration could be disciplined for wearing peace button while treating wounded veterans].)

Thus, insofar as it applies to school employees engaged in curricular activities, district's restriction on political speech falls within the power of schools to dissociate themselves from matters of political controversy. (*Kuhlmeier, supra*, 484 U.S. at p. 272 [98 L.Ed.2d at p. 606].)

In concluding that district's policy is valid with respect to classroom activities, we have considered the holding in *James* and found nothing in that case which alters our views. In *James* the court held a high school teacher was improperly disciplined for wearing a black armband as an expression of his opposition to the Vietnam War. The holding in *James* is not helpful here for a number of reasons. First, and perhaps most importantly, the court did not have the benefit of the Supreme Court's opinion in *Kuhlmeier*. Secondly, in *James* the school district prevailed on a motion for summary judgment in the district court. Given that procedural posture of the case, the court of appeals noted it was required to accept all the teacher's factual allegations as true, including contentions with respect to what impact the armband had on students. (See *James, supra*, 461 F.2d at p. 570, fn. 9.) In this procedural context, the court of appeals's conclusion that "[i]t does not appear from the record that any student believed the armband to be anything more than a benign symbolic expression of the teacher's personal views" (*id.* at p. 574) does not assist us in determining whether, following *Kuhlmeier*, a district may protect itself from the risk of having political views attributed to it by restricting political activities in curricular settings.

We also recognize article I, section 2 of the California Constitution provides independent protection for free speech which in certain contexts exceeds the protection provided by the First Amendment to the United States Constitution. (See, e.g., *Robbins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 908-911 [153 Cal.Rptr. 854, 592 P.2d 341].) Nonetheless, we find the federal authorities which discuss First Amendment principles in the fairly unique context of school regulation of curricular activities accurately weigh the competing interests of school administrators, teachers and students. (See, e.g., *DiBona* v. *Matthews* (1990) 220 Cal.App.3d 1329, 1344-1348 [269 Cal.Rptr. 882]; *Leeb* v. *DeLong, supra*, 198 Cal.App.3d at pp. 54-55.) Our consideration of these authorities convinces us that under the

California Constitution, as well as the First Amendment, school authorities retain the power to dissociate themselves from political controversy by prohibiting their employees from engaging in political advocacy in instructional settings.

In sum then we find no statutory or constitutional impediment to application of district's regulation in instructional settings.

## C. *Activities Outside the Classroom*

■ Next we turn to noninstructional settings. In this area we are governed by the holding in *L.A. Teachers*, *supra*, 71 Cal.2d at page 561.

In *L.A. Teachers* a teachers' union asked for permission to circulate a petition opposing reduction in financing for higher education. The union proposed circulating the petition among teachers during off-duty lunch hours on school premises. In upholding their right to do so, the court stated: "Harmony amoung public employees is undoubtedly a legitimate governmental objective as a general proposition [citation]; however, as we have seen, government has no interest in preventing the sort of disharmony which inevitably results from the mere expression of controversial ideas. [Citations.] It cannot seriously be argued that school officials may demand a teaching faculty composed either of unthinking 'yes men' who will uniformly adhere to a designated side of any controversial issue or of thinking individuals sworn never to share their ideas with one another for fear they may disagree and, like children, extend their disagreement to the level of general hostility and uncooperativeness." (71 Cal.2d at p. 561.)

Accordingly, under *L.A. Teachers*, school employees have the right to express to each other their respective political viewpoints on school property. Although, like the court in *Tinker*, the court in *L.A. Teachers* did not directly address the question of whether the teachers' activities might be attributed to the schools, we believe that consideration of this question would not have altered the result the court reached in *L.A. Teachers*. The relationship between coemployees has none of the elements of power and influence which exist between elementary and secondary school students and their instructors. Thus when teachers and other district employees express their political views to each other, there is very little risk their views will be unduly influential and thereby implicitly attributed to the school district.

Thus the school's ban on political advocacy cannot be enforced in noninstructional settings.

## DISPOSITION

District's goal in regulating the political activities of its employees is fairly straightforward. According to district's circular, it does not wish to become involved in sponsoring or subsidizing political activities. Moreover, district has attempted to achieve its goal in a fairly uncomplicated fashion: it has banned such activities by its employees while they are working. In the end, our analysis respecting the district's limitation is also fairly straightforward and uncomplicated: the ban may be enforced in instructional settings and it may not be enforced in noninstructional settings.

Under these circumstances there is no risk that we will invade the legitimate policy making prerogatives of district by holding that as applied to noninstructional settings district's regulation is unconstitutional but that in instructional settings it may be enforced. (Cf. *United States* v. *Grace* (1983) 461 U.S. 171, 183 [75 L.Ed.2d 736, 747-748, 103 S.Ct. 1702] [ban on sign-carrying in and around Supreme Court building invalid as applied to sidewalks around building] and *United States* v. *National Treasury Employees Union*, *supra*, 513 U.S. at pp. __, __ [130 L.Ed.2d at pp. 978-981, 985-987] [court declines to save honoraria ban by holding it may be applied only when required nexus between work and speech exists].)

Accordingly, the trial court's order granting SDTA's writ is modified to provide district's policy may be enforced against employees engaged in instructional activities. As modified the order is affirmed. Each party to bear its own costs of appeal.

Haller, J., and McDonald, J., concurred.