BILL LOCKYER Attorney General ANTHONY S. Da VIGO Deputy Attorney General
THE HONORABLE JACK SCOTT, MEMBER OF THE STATE SENATE, has requested an opinion on the following question:
May a school district prohibit teachers from wearing political buttons while attending Back-to-School Night, an annual event where teachers meet with parents to discuss the curriculum and related matters for the coming school year?
 CONCLUSION
A school district may not prohibit teachers from wearing political buttons while attending Back-to-School Night, an annual event where teachers meet with parents to discuss the curriculum and related matters for the coming school year.
 ANALYSIS
The question presented for resolution concerns a school event during which teachers meet with parents shortly after the beginning of the school year. The event, known as Back-to-School Night, allows the teachers and parents to discuss the curriculum, grading standards, classroom policies and procedures, and related matters. The teachers are considered to be "on duty" in the sense that their attendance is normally required and compensated by the school district.[1]
May a school district prohibit its teachers from wearing political buttons while attending Back-to-School Night? In contrast to the authority of district officials to prohibit the wearing of political buttons when the teachers are in their classrooms instructing their students (see California Teachers Assn. v. Governing Board (1996)45 Cal.App.4th 1383, 1388-1392; 77 Ops.Cal.Atty.Gen. 56, 63-64 (1994)), we conclude that such a prohibition with respect to Back-to-School Night would be unconstitutional.[2]
First, with respect to the statutory provisions governing the political rights of school employees (Ed. Code, §§ 7050-7057),[3]
"[t]he Legislature finds that political activities of school employees are of significant statewide concern" and that "[t]he provisions of this article [§§ 7050-7057] shall supersede all provisions on this subject in any city, county, or city and county charter as well as in the general law of this state" (§ 7050). Section 7052
establishes the general prohibition against restricting the political rights of school employees:
 "Except as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a local agency."[4]
Section 7055 specifically authorizes the placement of restrictions on political activities in two situations:
 "The governing body of each local agency may establish rules and regulations on the following:
 "(a) Officers and employees engaging in political activity during working hours.
 "(b) Political activities on the premises of the local agency."
"By its terms, section 7055 plainly gives school districts the power to restrict political speech during working hours." (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at p. 1387.) Section 7055 also permits regulation of political activities occurring on school premises. Hence, section 7055 on its face generally permits the adoption of a rule or regulation restricting the political activities of school teachers.
Would such a prohibition, as applied to an assembly of adults at Back-to-School Night, by a school district pursuant to the terms of section 7055 be consistent with the United States and California Constitutions? The First Amendment of the United States Constitution provides: "Congress shall make no law . . . abridging the freedom of speech. . . ." This restriction against the exercise of federal power is applicable to state and local agencies by virtue of the due process clause of the Fourteenth Amendment. (See Lee v. Weisman (1992) 505 U.S. 577,580.)
Article I, section 2, subdivision (a) of the California Constitution provides: "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." While the California Constitution has been held to afford greater protection than the First Amendment (Robins v. Pruneyard Shopping Center (1970) 23 Cal.3d 899, 908), the "power to impose . . . restrictions on [expressive] activity is nonetheless measured by federal constitutional standards." (Savage v. Trammell Crow Co. (1990) 223 Cal.App.3d 1562,1572-1573; see U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory (1984) 154 Cal.App.3d 1157, 1164-1165). Because we believe that the conclusion here would be the same under either the federal or state Constitution (see, e.g., California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at p. 1391; DiBona v. Matthews (1990) 220 Cal.App.3d 1329, 1346), we will rely on federal and state cases interchangeably in our discussion.
In Tinker v. Des Moines Independent Community School Dist. (1969)393 U.S. 503, the basic principles regarding the First Amendment rights of teachers and students were stated as follows:
 "First Amendment rights, applied in light of the special characteristics of the school environment are available to teachers and students. It can hardly be said that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate. . . .
 ". . . On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. . . ." (Id. at pp. 506-507.)
Where the speech by a teacher or student might be considered as coming from the school district itself, the district has greater latitude in restricting First Amendment activity. (Downs v. Los Angeles Unified School District (9th Cir. 2000) 228 F.3d 1003, 1009; California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at p. 1388.) School authorities may refuse to allow speech that might reasonably be perceived as associating "the school with any position other than neutrality on matters of political controversy." (Hazelwood School Dist. v. Kuhlmeier (1988) 484 U.S. 260, 272; accord, California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at p. 1388; 77 Ops.Cal.Atty.Gen., supra, at p. 62.)
Moreover, it has long been recognized that a government agency has far broader powers in regulating the speech of its employees than regulating the speech of the general citizenry. As explained in the plurality opinion of Justice O'Connor in Waters v. Churchill (1994) 511 U.S. 661,674-675:
 ". . . [T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks as effectively and efficiently as possible. When someone who is paid a salary so that she will contribute to an agency's effective operation begins to do or say things that detract from the agency's effective operation, the government employer must have some power to restrain her. . . .
 "The key to First Amendment analysis of government employer decisions, then, is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate."
In California Teachers Assn. v. Governing Board, supra,45 Cal.App.4th 1383, the court distinguished between the situations where the teachers were wearing political buttons while teaching their students and where the teachers were not providing instruction to their pupils. The court observed:
 "We find the district has the power to prevent its employees from wearing political buttons in its classrooms and when they are otherwise engaged in providing instruction to the district's students. On the other hand we find the district has no such power when its employees are not engaged in instructional activities." (Id. at p. 1385.)
In striking a balance between the First Amendment rights of the teachers and the legitimate needs of a school district to achieve its educational goals (id. at pp. 1387-1388), the court observed:
 ". . . [W]hen public school teachers and administrators are teaching students, they act with the imprimatur of the school district which employs them and ultimately with the imprimatur of the state which compels students to attend their classes. [Citations.] Indeed, it is the state's willingness to lend its power and financial support to elementary and secondary education which in fact gives teachers the opportunity and authority to mold young and impressionable minds.
 ". . . The school's imprimatur is not a distinct or easily isolated portion of a teacher's classroom role. Rather, the considerable resources schools spend in attempting to create trust, obedience and admiration for teachers operate with every instruction, request or question a teacher asks of his or her pupils. [Citations.] In this intimate and deferential environment, public school authorities may reasonably conclude it is not possible to both permit instructors to engage in classroom political advocacy and at the same time successfully dissociate the school from such advocacy. In short the very attributes of a successful teacher/student relationship make it reasonable for school authorities to conclude the only practical means of dissociating a school from political controversy is to prohibit teachers from engaging in political advocacy during instructional activities." (Id. at p. 1390.)
The court relied upon the Supreme Court's decision in L.A. Teachers Union v. L.A. City Bd. of Ed. (1969) 71 Cal.2d 551, in contrasting a district's control over the First Amendment rights of teachers exercised outside the classroom:
 "Next we turn to noninstructional settings. In this area we are governed by the holding in L.A. Teachers, supra, 71 Cal.2d at page 561.
 "In L.A. Teachers a teachers' union asked for permission to circulate a petition opposing reduction in financing for higher education. The union proposed circulating the petition among teachers during off-duty lunch hours on school premises. In upholding their right to do so, the court stated: `Harmony among public employees is undoubtedly a legitimate governmental objective as a general proposition [citation]; however, as we have seen, government has no interest in preventing the sort of disharmony which inevitably results from the mere expression of controversial ideas. [Citations.] It cannot seriously be argued that school officials may demand a teaching faculty composed either of unthinking "yes men" who will uniformly adhere to a designated side of any controversial issue or of thinking individuals sworn never to share their ideas with one another for fear they may disagree and, like children, extend their disagreement to the level of general hostility and uncooperativeness.' [Citation.]
 "Accordingly, under L.A. Teachers, school employees have the right to express to each other their respective political viewpoints on school property. Although, like the court in Tinker, the court in L.A. Teachers did not directly address the question of whether the teachers' activities might be attributed to the schools, we believe that consideration of this question would not have altered the result the court reached in L.A. Teachers. The relationship between coemployees has none of the elements of power and influence which exist between elementary and secondary school students and their instructors. Thus when teachers and other district employees express their political views to each other, there is very little risk their views will be unduly influential and thereby implicitly attributed to the school district.
 "Thus the school's ban on political advocacy cannot be enforced in noninstructional settings." (Id. at p. 1392.)
The court therefore concluded:
 "Under these circumstances there is no risk that we will invade the legitimate policy making prerogatives of [the] district by holding that as applied to noninstructional settings [the] district's regulation is unconstitutional but that in instructional settings it may be enforced. [Citations.]" (Id. at p. 1393.)
We believe that the court's analysis in California Teachers may be readily applied to the Back-to-School Night program. The event does not involve an instructional setting for pupils of the district. Rather, the parents are in attendance to show support for their children's educational activities. In this setting, it reasonably need not be feared that "young and impressionable minds" will be unduly influenced by teachers wearing political buttons or that the parents will believe that the teachers' political buttons reflect the views of the district's governing board or other school officials. Specifically, there would be very little risk that even if some parents disagreed with the content of a particular political button, they would "`like children, extend their disagreement to the level of general hostility and uncooperativeness.'" (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at p. 1392.)
We conclude that a school district may not prohibit teachers from wearing political buttons while attending Back-to-School Night, an annual event where teachers meet with parents to discuss the curriculum and related matters for the coming school year.
[1] The Back-to-School Night program is widely conducted throughout the country. In Bellmore-Merrick, etc. v. Bellmore-Merrick, etc. (1975)378 N.Y.S.2d 881, 885, the court observed:
 ". . .[T]he longstanding conduct of the parties establishes quite plainly that attendance at the Back-to-School Night is an activity which the parties have considered to be an integral part of the professional duties of the teachers and the teachers do not have the option to refuse to participate therein.
 "That this extracurricular activity has been so viewed by the parties is not at all surprising for the day in which the concept was held that the teaching duty was limited to classroom instruction has long since passed and teachers are well aware of the fact that there are some activities within the scope of their professional responsibilities which must be performed after the close of the regular school session."
[2] We may assume for our purposes that the political buttons in question would be of the same type considered in California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th 1383.
[3] All references hereafter to the Education Code are by section number only.
[4] The clause concerning the requirements of federal law pertains to positions for which federal funds are obtained. However, we are informed that in making funds available to local school districts, the practice of the federal government has been to waive any applicable federal restrictions. "Local agency" is defined in section 7051 to include "an elementary, high, or unified school district. . . ."