5 Cal.Rptr.3d 308 (2003)
112 Cal.App.4th 522
TURLOCK JOINT ELEMENTARY SCHOOL DISTRICT, Petitioner,
v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent; Turlock Teachers Association, Real Party in Interest.
No. F041187.
Court of Appeal, Fifth District.
October 3, 2003.
Review Denied January 22, 2004.[*]
*309 Currier & Hudson, Richard J. Currier, C. Anne Hudson, El Cajon, and Andrea Naested for Petitioner.
Robert Thompson, General Counsel, and Marie A. Nakamura, Legal Counsel, for Respondent.
Priscilla Winslow, Beverly Tucker, Ramon Romero, Diane Ross, Burlingame, and Ballinger G. Kemp, Oakland, for Real Party in Interest.

OPINION
WISEMAN, J.
Real party in interest Turlock Teachers Association (TTA) filed an unfair practice *310 charge with respondent Public Employment Relations Board (PERB). TTA alleged that petitioner Turlock Joint Elementary School District (District) violated the Educational Employment Relations Act (EERA)[1] by prohibiting teachers from wearing buttons, during instructional times, in support of TTA's bargaining demands. A PERB administrative law judge issued a proposed decision dismissing TTA's unfair practice charge on the ground the teachers' wearing of the buttons during instructional times constituted "political activity" that could be prohibited by the Education Code. PERB disagreed and reversed the administrative law judge's proposed decision, concluding that the District violated the EERA by prohibiting teachers from wearing union buttons. The District petitioned for review.
We publish to address whether a teacher's wearing of union buttons in the classroom during class time constitutes "political activity," which may be restricted by the District under the Education Code. Since we find the wearing of union buttons during instructional time inherently political under the Education Code, we reverse the decision of PERB.

PROCEDURAL AND FACTUAL HISTORIES
The facts are not in dispute. The District is comprised of eight elementary schools, instructing in kindergarten through eighth grade. TTA is the bargaining representative for teachers in the District. During the 1999-2000 school year, the District and TTA were negotiating a successor contract. Negotiations progressed very slowly. By May 2000, the parties had not yet reached an agreement.
As a result, members of TTA devised a strategy to advance their bargaining position, which included a letter-writing campaign to the school board and newspaper; distribution of informational fliers; pickets; attendance at school board meetings; telephone calls to parents; and teacher rallies to build solidarity.
Another of TTA's strategies was for teachers to wear buttons in support of their bargaining position, as they had done in the late 1980's during a previous bargaining crisis. The circular button, approximately two inches in diameter, had a burnt orange perimeter and a white background with "Turlock Schools" across the top arc and the numbers 9, 11 and 14 on the lower arc. The center of the button contained a black number 1 with a burnt orange slash through it. A smaller handwritten "TTA" was located on the lower left portion of the button. TTA recommended the teachers wear these buttons at all times to communicate and publicize their position that they had slipped from number 1 in the county in teacher salaries and benefits to number 9, number 11, and finally number 14. The button was large enough for students to read from anywhere in the classroom. Later, new buttons with a similar design were distributed to some teachers. The purpose of the button campaign was to publicize to the community TTA's demand; to build solidarity among the membership; and to demonstrate to the administration that the teachers were unified. TTA utilized various methods to communicate with its members regarding the contract negotiations, including both written and telephonic communications. It had an automated telephone system and had access to school mailboxes and bulletin boards to distribute and publicize information.
*311 Most of the teachers taught in self-contained classrooms where only the teacher and students were present. However, some classrooms had parent volunteers or teacher's aides. Some teachers testified that they wore the buttons in their classrooms to show support for TTA's position, while others said that they wore the buttons at all times only because it was more convenient than repeatedly putting them on and taking them on throughout the day. Numerous teachers testified that wearing the buttons caused no disruption to the educational process and they were not aware of any parent complaints about the buttons. Most of the school principals appeared to be aware that the teachers were wearing the buttons on campus.
The District had a long-standing policy prohibiting employees from engaging in political activities during working time. By letter dated June 1, 2000, the assistant superintendent of the District advised the president of TTA as follows:
"It has been brought to my attention that teachers are engaging in political activity during times when they are directly engaging in instructional activities with students. Although teachers certainly have the right of free speech, there are restrictions which are recognized by the courts. For example, teachers must refrain from engaging in political advocacy with students during instructional activities. Teachers must not wear political buttons, including buttons covering union political activities, during instructional times or during other instructional settings....
"As public employees, we all enjoy freedom of speech, but we must not engage in political advocacy when students are present during instructional activities. Students are present to learn the adopted curriculum, and not to be subjected to unrelated political activity.
"Your prompt cooperation in informing your members of these restrictions would be appreciated...."
The teachers immediately complied with the District's request to remove the buttons during instructional times. On November 28, 2000, TTA filed with PERB an unfair practice charge against the District. TTA alleged that, as a result of the District's order directing the teachers to remove the buttons, the District interfered with the teachers' rights to participate in the activities of TTA. TTA also alleged that the District interfered with its rights to communicate with its members, conduct organizing activities designed to demonstrate solidarity, and build support for its bargaining demands. Later, PERB issued a complaint against the District alleging violation of employee rights under the EERA.
On April 11, 2001, a hearing commenced before an administrative law judge of PERB. The administrative law judge issued a proposed decision dismissing the complaint against the District on the ground that TTA's button was political activity the District could restrict during instructional times in accordance with Education Code section 7055 and California Teachers Assn. v. Governing Board (1996) 45 Cal.App.4th 1383, 53 Cal.Rptr.2d 474.
Both the District and TTA filed statements of exceptions to the proposed decision. On July 17, 2002, PERB issued its decision, reversing the proposed decision of the administrative law judge. PERB held that the wearing of TTA's button was not political activity prohibited by the Education Code and that the District interfered with employee rights under the EERA by prohibiting such activity.
The District petitioned for a writ of extraordinary relief from the decision of PERB pursuant to section 3542, subdivisions *312 (b) and (c). We issued a writ of review.

DISCUSSION
The District maintains we should issue an extraordinary writ directing PERB to vacate its decision based on two principal grounds: 1) sections 3543 and 3543.1, subdivision (b), of the EERA should be interpreted to cover teachers wearing union buttons during instructional activities when elementary school students are present; and 2) teachers' wearing of union buttons during instructional activities constitutes "political activity," which may be prohibited pursuant to Education Code section 7055.

I. Standard of review
A reviewing court's relationship to an agency such as PERB is generally one of deference. (Regents of University of California v. Public Employment Relations Bd. (1986) 41 Cal.3d 601, 617, 224 Cal.Rptr. 631, 715 P.2d 590.) "The findings of [PERB] with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, are conclusive." (§ 3542, subd. (c).) In addition, "[interpretation of the EERA `falls squarely within PERB's legislatively designated field of expertise. Under established principles, PERB's construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous. [Citations.]' [Citation.]" (Cumero v. Public Employment Relations Bd. (1989) 49 Cal.3d 575, 586-587, 262 Cal.Rptr. 46, 778 P.2d 174; see also San Lorenzo Education Assn. v. Wilson (1982) 32 Cal.3d 841, 850, 187 Cal.Rptr. 432, 654 P.2d 202.)
In short, if PERB's interpretation of the EERA is reasonably defensible, we cannot reject it merely because we might prefer another view. (See Oakland Unified School Dist. v. Public Employment Relations Bd. (1981) 120 Cal.App.3d 1007, 1012, 175 Cal.Rptr. 105.) As explained by the California Supreme Court:
"PERB has a specialized and focused task'to protect both employees and the state employer from violations of the organizational and collective bargaining rights guaranteed by the [EERA].' [Citation.] As such, PERB is `one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect.' [Citation.]" (Banning Teachers Assn. v. Public Employment Relations Bd. (1988) 44 Cal.3d 799, 804, 244 Cal.Rptr. 671, 750 P.2d 313.)
However, when issues of law arise outside the EERA, and correspondingly outside the area of PERB's expertise, we need not defer to PERB's interpretation. (See N.L.R.B. v. Better Bldg. Supply Corp. (9th Cir.1988) 837 F.2d 377, 378; see also Stermer v. Board of Dental Examiners (2002) 95 Cal.App.4th 128, 132, 115 Cal. Rptr.2d 294 [where evidence only involves issue of law, we apply our independent judgment regarding action of administrative agency].)
With these principles in mind, we evaluate the District's contentions.

II. The EERA
The District first maintains that PERB erred in concluding that the wearing of union buttons in this case was a protected activity under the EERA. The District contends that PERB interpreted section 3543 and section 3543.1, subdivision (b), of the EERA too broadly to cover the *313 wearing of a union button during instructional activities where only the teacher and students are present.
Section 3543, subdivision (a), states: "Public school employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." Section 3543.1, subdivision (b), provides:
"Employee organizations shall have the right of access at reasonable times to areas in which employees work, the right to use institutional bulletin boards, mailboxes, and other means of communication, subject to reasonable regulation, and the right to use institutional facilities at reasonable times for the purpose of meetings concerned with the exercise of the rights guaranteed by this chapter."
The District argues that nothing in this statutory language suggests it was intended to include communications from teachers directly to students during instructional times where the students are a captive audience and these communications are bargaining advertisements in support of union demands. The District asserts that the phrases "reasonable times" and "reasonable regulation" imply a limitation during instructional activities with elementary school students. In light of this, the District implores us to exclude the wearing of union buttons from the description "other means of communication," arguing that protected conduct typically involves internal communications between employees or between employees and their employee organization. In this case, the District insists, TTA engaged in an array of activities to communicate with its members, and the wearing of the union button should not be a protected "other means of communication" between employees and their organization when the button is worn in the classroom during instructional times.
Although the District makes an interesting point, it ignores the applicable standard of review. We are not free to substitute our view for that of PERB's. Instead, our role is to determine whether PERB's interpretation of the EERA is clearly erroneous. On this record, it is not.
We note at the outset that there is no case authority directly addressing the question of whether teachers' wearing of union buttons during instructional times is a protected activity under the EERA. In finding the activity protected, PERB reasoned:
"The wearing of union buttons is a protected right under [the] EERA, absent special circumstances. This position is clearly supported by [PERB] case law and private sector precedent .... [¶] ... [¶] There is no evidence in the record in the instant case to indicate that any `special circumstances,' such as safety, discipline, effect on the employer, or any `disruption,' were caused by the union buttons. Therefore, the protected right to engage in such protected activity under [the] EERA remains intact." (Fns. omitted.)
PERB's conclusion is supported by its own precedent and case law interpreting the National Labor Relations Act.[2] *314 PERB held in State of California (Department of Parks and Recreation) (1993) PERB Decision No. 1026 S [18 PERC ¶ 25011]: "[T]he wearing of union buttons is a protected right, absent special circumstances .... The right to wear buttons is not unlimited and is subject to reasonable regulation. If special circumstances exist, then the employer may well be within its rights to limit or prohibit the wearing of buttons by employees." PERB went on to hold that it is incumbent upon the employer that banned the wearing of all union buttons to "demonstrate special circumstances for such a prohibition." (Id.; see also Carlsbad Unified School District (1979) PERB Decision No. 89 [in cases of alleged interference, violation will be found when employer's conduct results in harm to employee rights under EERA and employer is unable to justify conduct by proving operational necessity].) PERB also noted that "although alternative means of communication might be available, this does not make the buttons any less legitimate. Whether or not other means of communication are available does not deny a particular form of access. Only when a particular type of communication is `disruptive' will [PERB] look to the existence of other means of communications." (State of California (Department of Parks and Recreation), supra, PERB Decision No. 1026-S.)
Case law interpreting the National Labor Relations Act has similarly recognized, as a legitimate form of union activity, the right of employees to wear union buttons in the workplace. (See Republic Aviation Corp. v. Board (1945) 324 U.S. 793, 801-803, 65 S.Ct. 982, 89 L.Ed. 1372.) "[Absent `special considerations,' an employee has a right, protected by ... [the National Labor Relations Act], to wear union buttons and insignia at work. [Citation.]" (Pay'N Save Corp. v. N.L.R.B. (9th Cir. 1981) 641 F.2d 697, 700 [fn. omitted]; see also Meijer, Inc. v. N.L.R.B. (6th Cir.1997) 130 F.3d 1209, 1217 [employees have right to wear union insignia unless employer makes affirmative showing that special circumstance exists to justify restriction]; St. Luke's Hospital (1994) 314 NLRB 434, 435 ["It is well-settled that the wearing of [union] insignia may not be prohibited unless the employer establishes that `special circumstances' are present which justify the restriction."].)
Examples of special circumstances that have justified a ban on union buttons include situations where employer operations are disrupted, employee safety or discipline is jeopardized, or employee dissension is encouraged. (See Pay'N Save Corp. v. N.L.R.B., supra, 641 F.2d at p. 700; Fabri-Tek, Incorporated v. N.L.R.B. (8th Cir. 1965) 352 F.2d 577, 583-587; Andrews Wire Corporation (1971) 189 NLRB 108, 109; United Aircraft Corporation (1961) 134 NLRB 1632, 1635; cf. Meijer, Inc. v. N.L.R.B., supra, 130 F.3d at p. 1217 [retailer unable to make showing of special circumstance to justify ban on employees wearing union insignia based on contention of negative impact on its public image]; Asociacion Hosp. Del Maestro, Inc. v. N.L.R.B. (1st Cir.1988) 842 F.2d 575, 577-578 [evidence of hospital patient anxiety did not justify ban on union insignia at all places in hospital].) General, speculative, isolated or conclusory evidence of disruption does not amount to special circumstances. (Boise Cascade Corporation (1990) 300 NLRB 80, 82; see also St. *315 Luke's Hospital, supra, 314 NLRB at p. 435 [mere possibility of patient complaints about union buttons not sufficient to establish special circumstances].)
In this case, there is no evidence of any special considerations or circumstances to justify a ban on teachers wearing the union buttons during instructional times. None of the teachers who testified considered the buttons to be disruptive in the classroom. Further, the District presented no evidence to show that wearing union buttons in the classroom disrupted its operations or affected the education of the students. There were no complaints from either students or parents. In short, there is no evidence that the buttons were in any way disruptive to the educational process. This likely explains why the District did not prohibit teachers from wearing union buttons during instructional times on the ground that doing so was disruptive. Instead, the District prohibited the conduct based on the rationale that it constituted political activity and could be barred under Education Code section 7055.
There is no question the EERA does not supersede the Education Code. (See § 3540 ["This chapter shall not supersede other provisions of the Education Code and the rules and regulations of public school employers ... which provide for other methods of administering employer-employee relations, so long as the rules and regulations or other methods of the public school employer do not conflict with lawful collective agreements."]; Ed.Code, § 7050.) We turn then to section 7055 of the Education Code.

III. The Education Code
The District argues that teachers' wearing of union buttons during instructional times constitutes "political activity," which may be prohibited under Education Code section 7055. In support of its contention, the District relies heavily on California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th 1383, 53 Cal.Rptr.2d 474, which upheld a school district's restriction on teachers wearing political buttons during instructional activities.
Education Code section 7050 provides: "The Legislature finds that political activities of school employees are of significant statewide concern. The provisions of this article shall supersede all provisions on this subject in any city, county, or city and county charter as well as in the general law of this state." Education Code section 7052 mandates that "[e]xcept as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on political activities of any officer or employee of a local agency." The term "local agency" includes "an elementary, high, or unified school district...." (Ed.Code, § 7051.)
Education Code section 7055 specifically authorizes the placement of restrictions on political activities in certain circumstances:
"The governing body of each local agency may establish rules and regulations on the following:
"(a) Officers and employees engaging in political activity during working hours.
"(b) Political activities on the premises of the local agency."
By its very terms, Education Code section 7055 plainly gives school districts the power to restrict political speech during working hours. (California Teachers Assn. v. Governing Board, supra, 45 Cal. App.4th at p. 1387, 53 Cal.Rptr.2d 474.) In California Teachers Assn. v. Governing Board, supra, the court addressed whether a school district can restrict its employees from wearing political buttons during *316 instructional activities. The political activity in the case concerned the union's opposition to an initiative to adopt a voucher system of financing elementary and secondary education. (Id. at p. 1385, 53 Cal. Rptr.2d 474.)
The court framed the issue not as whether political activities by district employees during working hours materially and substantially jeopardized the interests of discipline or sound education. Instead, the court concluded, as a threshold matter, it had to determine whether and under what circumstances political activity by the district's employees fell within the district's power to dissociate itself from political controversy. (California Teachers Assn. v. Governing Board, supra, 45 Cal. App.4th at p. 1388, 53 Cal.Rptr.2d 474.) The court reasoned:
"The Supreme Court has consistently recognized the substantial influence and power instructors have over elementary and secondary age students in their classrooms. Thus, in holding that the state may not adopt a curriculum in elementary or secondary schools which advances the tenets of a particular religion, the court stated: `Students in such institutions are impressionable and their attendance is involuntary. [Citations.] The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure. [Citations.]' [Citation.] [¶] ... [¶]
"... [W]hen public school teachers and administrators are teaching students, they act with the imprimatur of the school district which employs them and ultimately with the imprimatur of the state which compels students to attend their classes. [Citations.] Indeed, it is the state's willingness to lend its power and financial support to elementary and secondary education which in fact gives teachers the opportunity and authority to mold young and impressionable minds.
"... The school's imprimatur is not a distinct or easily isolated portion of a teacher's classroom role. Rather, the considerable resources schools spend in attempting to create trust, obedience and admiration for teachers operate with every instruction, request or question a teacher asks of his or her pupils. [Citations.] In this intimate and deferential environment, public school authorities may reasonably conclude it is not possible to both permit instructors to engage in classroom political advocacy and at the same time successfully dissociate the school from such advocacy. In short the very attributes of a successful teacher/student relationship make it reasonable for school authorities to conclude the only practical means of dissociating a school from political controversy is to prohibit teachers from engaging in political advocacy during instructional activities.
"We also believe that wearing a political button is the type of advocacy which a school governing authority may restrict in instructional settings. Although [the union] has attempted to characterize button wearing as passive speech, this characterization ignores the power and influence teachers have within the classroom when they are engaged in teaching elementary and secondary school students. That power and influence give clear and loud voice to any buttons teachers wear while they are so engaged. In this regard we note that restrictions on button wearing have been upheld in other situations where employees have `close personal relationships for which personal loyalty and confidence are necessary.' [Citations.]

*317 "Thus, insofar as it applies to school employees engaged in curricular activities, district's restriction on political speech falls within the power of schools to dissociate themselves from matters of political controversy. [Citation.] [¶] ... [¶]
"... [However,] the school's ban on political advocacy cannot be enforced in noninstructional settings." (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th at pp. 1388-1392, 53 Cal.Rptr.2d 474; see also 77 Ops.Cal. Atty.Gen. 56 (1994) [school district may prohibit elementary school teachers from wearing buttons expressing political opinions on statewide ballot during classroom periods, as district has legitimate pedagogical interest in preventing students from viewing political material they may not understand and in protecting itself against perception its classrooms are being used for partisan political advantage]; cf. 84 Ops.Cal.Atty. Gen. 106 (2001) [school district may not prohibit teachers from wearing political buttons while attending back-to-school night, as event does not involve noninstructional setting for pupils].)
The District also relies on Wilmar Teachers Association (2000) PERB Decision No. 1371 [24 PERC ¶ 31053]. In that case, PERB dismissed an unfair practice charge where a school district ordered a teacher and union representative to remove her truck from the school parking lot because it displayed a large sign advocating named candidates for the board of trustees. However, there was no single consensus among the three PERB members for the holding. (Wilmar Teachers Association, supra, PERB Decision No. 1371, at pp. 20-23.)
The issue in this case turns on whether the wearing of union buttons during instructional times constitutes "political activity," a term not defined in the Education Code. We thus look to the rules of statutory construction articulated in People v. Superior Court (Gary) (2000) 85 Cal. App.4th 207, 213, 101 Cal.Rptr.2d 874:
"`The court's role in construing a statute is to "ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] "[I]t is the language of the statute itself that has successfully braved the legislative gauntlet." [Citation.]
"`When looking to the words of the statute, a court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]' [Citation.]" (See also Dyna Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1392, 241 Cal. Rptr. 67, 743 P.2d 1323 [statutes are to be given reasonable and commonsense interpretation consistent with apparent legislative purpose and intent and which, when applied, will result in wise policy].)
Black's Law Dictionary defines the term "political" as "[p]ertaining to politics; of or relating to the conduct of government." (Black's Law Dict. (7th ed.1999) p. 1178, col. 2.) The American Heritage Dictionary similarly defines the term "political" as follows:
"1. Of, relating to, or dealing with the structure or affairs of government, politics, or the state. 2. Relating to, involving, or characteristic of politics or politicians: 'Calling a meeting is a political act in itself .... 5. Having or influenced by partisan interests.... 6. Based on or motivated by partisan or self-serving *318 objectives...." (American Heritage Diet. (4th ed.2000) p. 1358, col. 2.)
In Abood v. Detroit Board of Education (1977) 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261, the United States Supreme Court recognized the political nature of unions.
"[D]ecisionmaking by a public employer is above all a political process. The officials who represent the public employer are ultimately responsible to the electorate.... Through exercise of their political influence as part of the electorate, the employees have the opportunity to affect the decisions of government representatives who sit on the other side of the bargaining table. Whether these representative accede to a union's demands will depend upon a blend of political ingredients, including community sentiment about unionism generally and the involved union in particular, the degree of taxpayer resistance, and the views of voters as to the importance of the service involved and the relation between the demands and the quality of service.... [¶] ... [¶]
"There can be no quarrel with the truism that because public employee unions attempt to influence governmental policymaking, their activities ... may be properly termed political." (Abood v. Detroit Board of Education, supra, 431 U.S. at pp. 228, 231, 97 S.Ct. 1782.)
We hold that the wearing of union buttons by teachers while instructing in the classroom falls within the definition of "political activity" set forth in Education Code section 7055 and may therefore be restricted by a school district. The union buttons pertained to conduct of the board of trustees of the District, a governmental entity. The purpose of wearing them was for teachers to attempt to persuade the governing board of trustees to change its position at the bargaining table. In short, TTA attempted to influence and modify District policy and budgetary choices. A school district's restriction of labor relations disputes to prevent such disputes from spilling over into the classroom is a proper restriction of political activity under Education Code section 7055. This is particularly true in an era in which school districts are pressured to maximize instructional minutes and achieve measurable educational results.
Citing to an opinion of the California Attorney General, PERB and TTA urge us to define political activity as activity relating only to the support or defeat of a ballot measure or candidate. PERB and TTA maintain that the Education Code implies such a limited definition, and they both distinguish California Teachers Assn. v. Governing Board, supra, on the ground that it related to an electoral campaign rather than union activity. We do not read the Education Code or California Teachers Assn. v. Governing Board so narrowly.
The opinion of the California Attorney General to which the parties refer (84 Ops. Cal.Atty.Gen. 52 (2001)) does not define political activity. It addresses whether Education Code section 7054, subdivision (a),[3] prohibits a school district from using district resources to implement a voluntary payroll deduction program allowing employees to make monthly contributions to a political action committee established by the union. The opinion makes no reference to Education Code section 7055 and does not define the section's reference to *319 political activity in any manner. Moreover, Education Code section 7054, subdivision (a), does not address political activities of employees; it addresses the misuse of public funds and property by a school district.
Instead, we believe the reasoning in California Teachers Assn. v. Governing Board, supra, is more applicable to the facts in this case. We conclude that the wearing of a union button is the type of political activity a school district may restrict in instructional settings. In its decision, PERB concluded that, were it not to limit the definition of political activity, "public employeesbecause they are public employeescould be barred from expressing their opinions on any matters related to collective bargaining, while private sector employees would not be so barred." This is true in the context of employees of a school district. Their employer has a special character, recognized in the Education Code and by the court in California Teachers Assn. v. Governing Board, supra. The political activities of school district employees are of "significant statewide concern[,]" and those employees are subject to special rules and regulations. (Ed.Code, § 7050.)
This is the bottom line:
"The first rule of teaching should be that teachers shall teach. A classroom is not a place for proselytizing students to advance a teacher's financial interests. Nor should a classroom be transmogrified into a teacher's soapbox. [Citation.] Just as a board of education may set the curriculum, it may also require teachers to confine their classroom activities to providing students with a thorough and efficient education." (Green TP. Educ. Ass'n v. Rome (A.D.2000) 328 N.J.Super. 525, 746 A.2d 499, 506 [upholding prohibition on teachers wearing "NJEA SETTLE NOW" union buttons in presence of students].)

DISPOSITION
We issue a peremptory writ of mandate directing PERB to vacate its July 17, 2002, decision (PERB Decision No. 1490) and issue a new decision dismissing the complaint and the underlying unfair practice charge. Costs are awarded to the District.
WE CONCUR: DIBIASO, Acting P.J., and GOMES, J.
WISEMAN, J., Concurring.
We are troubled that, under our holding, a school district can restrict a teacher from wearing a union button into the classroom even when the teacher takes steps to ensure there is no political discussion or disruption related to the button. We recognize that many dedicated teachers likely do not perceive the wearing of a union button in the classroom to be political activity. Further, we strongly suspect that the vast majority of teachers would never use a union button to engage in political activity. However, in interpreting the applicable rules, we must take into account those teachers who would use a union button for political purposes during instructional time.
That said, we observe that the restrictions in Education Code section 7055 are not mandatory but, instead, are permissive. As all parties in this case acknowledge, if teachers want to wear union buttons in the classroom, there is nothing prohibiting them from bargaining for the right to do so through the collective bargaining process. The parties here simply have not bargained for this. Nothing prevents them or other teachers in the same situation from doing so under the appropriate circumstances.
*320 In any event, we conclude that our decision is the right one for pragmatic reasons. First, our decision is limited to forms of communication occurring during class time. Short of some bright-line rule, the next issue before us will be whether a threeinch button (as opposed to a two-inch button) worn during instructional times is disruptive. Then will follow the need to resolve questions about the display during class time of signs, banners, bumper stickers, posters, and any other creative mode of communication. Addressing these situations has the potential to divert the parties from hitting head-on the important issues often central to union negotiations, especially in the context of education. During times when funding and tempers can be short, we do not believe that bickering over what can and cannot be displayed during class time benefits anyone.
I CONCUR: GOMES, J.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977).
[1] The EERA is codified at Government Code section 3540 et seq. All statutory references are to the Government Code unless otherwise indicated.
[2] If pertinent language of the National Labor Relations Act parallels that of the EERA, cases construing the former are persuasive precedent in interpreting the latter. (Public Employment Relations Bd. v. Modesto City Schools Dist. (1982) 136 Cal.App.3d 881, 885-886, 186 Cal.Rptr. 634; see also Fire Fighters Union v. City of Vallejo (1974) 12 Cal.3d 608, 617, 116 Cal.Rptr. 507, 526 P.2d 971 [applying National Labor Relations Act cases in interpreting scope of bargaining under city charter].) For example, in a provision similar to section 3543, subdivision (a), the National Labor Relations Act guarantees private-sector employees the right to form, join or assist labor organizations and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection. (See 29 U.S.C. § 157.)
[3] Education Code section 7054, subdivision (a), states: "No school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district."