65 Cal.Rptr.3d 288 (2007)
154 Cal.App.4th 866
SAN LEANDRO TEACHERS ASSOCIATION et al., Plaintiffs and Respondents,
v.
GOVERNING BOARD OF the SAN LEANDRO UNIFIED SCHOOL DISTRICT et al., Defendants and Appellants.
Nos. A114679, A115686.
Court of Appeal of California, First District, Division One.
August 28, 2007.
*292 Littler Mendelson, P.C., Garry G. Mathiason, Esq., Kimberly L. Owens, Esq., San Francisco, for Defendants and Appellants.
Liebert Cassidy Whitmore, Bruce A. Barsook, Esq., Los Angeles, Didier Y. Reiss, Esq., for California School Boards Association as Amicus Curiae on behalf of Defendants and Appellants.
California Teachers Association, Priscilla S. Winslow, Esq., Beverly Tucker, Esq., Ballinger G. Kemp, Esq., Ramon E. Romero, Esq., Burlingame, for Plaintiffs and Respondents.
Michael R. Clancy, Chief Counsel, Christina C. Bleuler, Staff Attorney, for California School Employees Association as Amicus Curiae on behalf of Plaintiffs and Respondents.
Rothner, Segall & Greenstone, Glenn Rothner, Esq., Pasadena, Jonathan Cohen, Esq., for American Federation of State, County and Municipal Employees, and Service Employees Union, Local 99 as Amicus Curiae on behalf of Plaintiffs and Respondents.
SWAGER, J.
The Governing Board of the San Leandro Unified School District, the San Leandro Unified School District (District), District Superintendent Christine Lim, and Assistant Superintendent Mike Martinez (collectively referred to as appellants) appeal the trial court's order granting the petition for peremptory writ of mandate brought by the San Leandro Teachers Association (SLTA) and the California Teachers Association (CTA) (collectively referred to as respondents), prohibiting appellants "from restricting the content of communications by SLTA placed in the District's mailboxes." Appellants also appeal the order granting respondents' motion for attorney fees.[1] We reverse.

STATEMENT OF THE FACTS AND PROCEDURAL BACKGROUND
The essential facts underlying this case are not in dispute. SLTA is the exclusive bargaining representative of the District's certificated employees. On October 11 and 12, 2004, SLTA distributed two employee newsletters by placing them in internal faculty mailboxes located at the District's schools. The first newsletter, entitled "SLATE," is a two-page memorandum from SLTA's president that contains a section discussing the upcoming school board election.[2] The second news *293 letter is a one-page memorandum addressed to SLTA's members, entitled "From the Table." Among other matters, this newsletter urges members to support SLTA's endorsed candidates for school board, and to engage in activities in support of these candidates.[3] Both newsletters were produced entirely at SLTA expense.
The District's mailboxes are permanent fixtures at each school, consisting of a wooden or metal frame grid that is fixed to the wall in school offices. Each certificated employee is assigned a mailbox. The normal intended purpose of the school mailboxes is to communicate with teachers and staff regarding school-related matters. Nonschool organizations do not have direct access to these mailboxes. Pursuant to District policy, materials generated by such organizations may not be placed in the mailboxes without the District's prior approval. As a representative employee organization, SLTA is allowed to use the mailboxes to communicate with its employee members pursuant to the Educational Employment Relations Act (Gov.Code, § 3540 et seq.) (EERA) and the collective bargaining agreement.
On October 15, 2004, Assistant Superintendent Martinez sent a letter to the president of SLTA advising him that the union is prohibited by Education Code[4] section 7054[5] from using school district mail facilities to distribute materials that contain political endorsements. The letter goes on to state: "[T]his letter serves to place you on notice that we will not allow the SLTA access to faculty mailboxes if any future distributions contain impermissible political endorsements."[6]
On November 16, 2004, SLTA filed an unfair practice charge with the Public Employee Relations Board (PERB), alleging that the District violated provisions of the EERA by prohibiting SLTA from distributing union newsletters containing its political endorsements via the school mailboxes.
On June 28, 2005, PERB adopted an earlier decision of one of its agents, dismissing the unfair practice charge. The agent had determined that "the plain meaning of [section 7054] prohibited the use of mailboxes as a means of distributing political information." The agency also relied on one of its own earlier decisions, which held that a school's internal mail system amounted to "services" or "equipment" within the meaning of section 7054.
On September 30, 2005, respondents filed a petition for peremptory writ of mandate to cause appellants to "cease and *294 desist from enforcing a policy which forbids [respondents] from placing in the school mailboxes any materials generated by the [SLTA] which contain references to candidates for public office or ballot initiatives." Appellants demurred to the writ petition, asserting that prohibiting the distribution of partisan political material via the mailboxes is both constitutional as a matter of law and mandated by section 7054.[7]
On May 3, 2006, the trial court granted the writ petition and overruled appellants' demurrer. Subsequently, the court awarded respondents their attorney fees under Code of Civil Procedure section 1021.5. This appeal followed.

DISCUSSION

I. Standard of Review
"`On appeal following a trial court's decision on a petition for a writ of mandate, the reviewing court "`need only review the record to determine whether the trial court's findings are supported by substantial evidence.'" [Citation.] However, we review questions of law independently. [Citation.]' [Citation.] Where, as here, the issue involves statutory interpretation, we exercise our independent judgment and review the matter de novo." (Armando D. v. State. Dept. of Health Services (2004) 124 Cal.App.4th 13, 21, 21 Cal.Rptr.3d 66.) We review de novo both the trial court's interpretation of the relevant provisions and the constitutional issues it resolved. (People ex rel. Lockyer v. Shamrock Foods Co. (2000) 24 Cal.4th 415, 432, 101 Cal.Rptr.2d 200, 11 P.3d 956; Baba v. Board of Supervisors (2004) 124 Cal.App.4th 504, 512, 21 Cal.Rptr.3d 428; Herbst v. Swan (2002) 102 Cal.App.4th 813, 816,125 Cal.Rptr.2d 836.)
Attorney fee awards under Code of Civil Procedure section 1021.5 are generally reviewed for abuse of discretion. (Graham v. DaimlerChrysler Corp. (2004) 34 Cal.4th 553, 578, 21 Cal.Rptr.3d 331, 101 P.3d 140.) "The questions are whether the court applied the proper legal standards under section 1021.5 and, if so, whether the result was within the range of the court's discretion [citation], i.e., whether there was a reasonable basis for the decision...." (Bowman v. City of Berkeley (2005) 131 Cal.App.4th 173, 177, 31 Cal. Rptr.3d 447.)

II. Education Code section 7054
The trial court determined that section 7054 did not bar the distribution of SLTA newsletters containing political matter through the District's mailboxes. The court found that, in the context of this case, "the `use' of public funds is nominal, at best. The mailboxes exist. There is no cost or use of public resources over and above the normal costs of the mailboxes which is incurred by the District on account of SLTA's use of the mailboxes. The newsletters at issue here are produced and distributed entirely by SLTA, with no use of any District resources. This is simply not the type of political campaigning activity to which section 7054 is directed." (Fn. omitted.)
Appellants maintain that they are required by section 7054 to prohibit respondents from using school mailboxes for partisan political campaigning. They assert that the trial court erroneously interpreted section 7054 to apply only to direct expenditures of District funds. They also claim *295 the court erred in finding that this section does not apply to the newsletters at issue here simply because the impact on public funds is "nominal." They note that PERB has interpreted this section to prohibit a district from "passively allow[ing] its mailboxes to be used to distribute union political materials...." (Am. Fed of Teachers Guild v. San Diego Community College Dist. (2001) PERB Dec. No. LA-CE4217-E [26 PERC ¶ 33014, p. 41, p. 43].)
Respondents argue that section 7054 does not apply to SLTA's use of the mailboxes because SLTA bears the cost of producing and distributing the message. They support their argument by noting that other sections of the Education Code allow for the solicitation of political contributions on school property and authorize school districts to allow nongovernmental speakers to engage in political discussions on school grounds. Thus, they conclude that section 7054 does not extend to the "passive toleration of the speech of others whose voice could not be confused with that of the government's." They also claim that a separate provision found in the EERA guarantees employee organizations access to faculty mailboxes.

A. Statutory Construction
We begin with a basic principle of statutory construction: We need not resort to legislative history or other interpretive aids if the statutory language itself is unambiguous. "`"If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs." [Citation.]' [Citation.]" (People v. Superior Court (Ghilotti) (2002) 27 Cal.4th 888, 905, 119 Cal. Rptr.2d 1, 44 P.3d 949; Lennane v. Franchise Tax Bd. (1994) 9 Cal.4th 263, 268, 36 Cal.Rptr.2d 563, 885 P.2d 976.)
In our view, section 7054 unambiguously decrees that school district resources may not be used in furtherance of political activities, regardless of the identity of the actor or the cost to the district.[8] The statute's use of the passive voice ("[n]o school district ... funds, services, supplies, or equipment shall be used") appears to us to be deliberate. If the Legislature had desired to limit the application of this provision to school districts only, it could easily have crafted the language to so state. We also observe that this section does not contain an exception for "nominal" uses, and we decline to interpret the statute to include such an exception.[9]
In support of respondents, amicus curiae California School Employees Association (CSEA) claims that SLTA's use of the mailboxes does not amount to a use of District funds, services, or equipment. CSEA argues that "equipment" is limited to objects that may be "handled." CSEA also asserts that the use at issue here does not involve a "service" because it does not require any act or activity on the part of the District.
We disagree. Manifestly, the internal mailbox system exists to provide a "service" to school districts and their employees. Mailboxes are a prompt and convenient delivery route by which a school *296 district (and others) may effectively communicate with school employees. They are thus distinguishable from a table in a faculty lunchroom, a mechanism for distribution whose success depends on the willingness of its intended audience to pick up the materials. Without centrally located internal school mailboxes, communication with staff would be rendered much less efficient. Common experience in traditional office settings supports the proposition that internal mailboxes perform an important and useful service.
We also believe that the mailboxes themselves constitute school district "equipment" in that they are tangible, specially constructed receptacles that, while not unduly expensive, are created and maintained solely by the district. And unlike tables, which can serve many functions, mailboxes are solely dedicated to the task of distributing information to individual recipients.
Respondents argue that their use of the internal mail system does not implicate section 7054 because it is indistinguishable from their use of the table in the faculty lounge upon which the District allows SLTA's newsletters to be placed. The trial court also discounted the application of the statute, positing that a technical reading of section 7054 would bar concededly permissible political discussions between teachers on school property due to the incidental costs to the District for lighting, heating, and furniture. Further, the court suggested that such a reading would prevent a teacher with a car bearing a political bumper sticker from using a school parking lot.
The issue in this case, however, is not whether placing newsletters containing political endorsements on a table in the faculty lounge violates section 7054. Nor need we dwell on bumper stickers or the incidental utility costs incurred in connection with decidedly authorized political activities. The issue we must focus on is whether the Legislature, in enacting section 7054, has limited a school's internal mail system to nonpolitical uses only. We believe it has.
In arguing that section 7054 applies to the District only, respondents rely heavily on an opinion of the California Attorney General, which found that school districts are not prohibited by section 7054 from using district resources to implement a voluntary payroll deduction program allowing employees to make monthly contributions to a political action committee. In addressing section 7054, the opinion states: "We have examined in detail the legislative history of section 7054____ The evident purpose of the statute is to prevent partisan campaigning by a district; a district's resources are not to be used for political campaigning." (84 Ops.Cal.Atty.Gen. 52, 53-54 (2001) italics added.) Respondents place much significance on the italicized language.
Opinions of the Attorney General are not binding on this court. (Sanchez v. Unemployment Ins. Appeals Bd. (1977) 20 Cal.3d 55, 67, 141 Cal.Rptr. 146, 569 P.2d 740.)[10] In any event, we do not believe that the circumstances addressed in the opinion are analogous to those of the present case. In the opinion, the Attorney General notes that "[i]t would be unreasonable to apply section 7054 where the school district ... is merely transmitting a portion of the employee's salary as directed *297 by the employee." (84 Ops.Cal.Atty.Gen., supra, 52, 54.) The opinion goes on to observe that a district would not have engaged in political activity simply by facilitating the transfer of funds because the district's resources would not have been used "for the purpose" of supporting a political cause, since only the money actually transferred into the account would be so used. (Id at p. 53.) In contrast, in the present case, respondents seek direct access to a public resource in order to communicate their message to their intended audience more effectively.
CSEA requests that we take judicial notice of the legislative history of section 7054. We have granted this request. A 1995 amendment eliminated exemptions that previously allowed school boards to advocate for ballot measures relating to school funding. (The exemptions were contained in former §§ 35174 & 72632.) (See Legis. Counsel's Dig., Sen. Bill No. 82, ___ Stats. 1995 (1995-1996 Reg. Sess.) Summary Dig., pp. 378-379.) The bill also added language to section 7056 designed to prohibit district employees, during working hours, from soliciting or receiving funds to support or defeat ballot measures that affect their compensation or working conditions. (Ibid.)
The Senate Analysis of Senate Bill No. 82 states: "Existing law generally prohibits the use of K-12 school or community college district funds for the purpose of supporting or opposing local district ballot measures or candidates." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 82 (1995-1996 Reg. Sess.) as amended May 18, 1995, par. 1.) The Analysis further notes that "The purpose of this bill is to ensure that public school and community college funds and resources are not used for political purposes." (Id. at par. 9.) Thus, while the amendment eliminated a specific exemption that had applied to school boards, it does not appear that the Legislature intended section 7054 to be limited to school boards only, but rather intended that it apply to all uses of school district resources.

B. Relationship to Other Education Code Sections
Respondents also rely on section 7052, which provides: "Except as otherwise provided in this article, or as necessary to meet requirements of federal law as it pertains to a particular employee or employees, no restriction shall be placed on the political activities of any officer or employee of a [school district]." While respondents read the last clause of this statute expansively, the first clause of this section clearly takes into account the fact that other sections within the article may operate to impinge on the political activities of school district employees. We believe that section 7054 embodies such a limitation. Moreover, section 7055, subdivision (b), specifically allows school districts to regulate "[p]olitical activities on the premises of the [school district]."
Respondents also point out that section 7056 permits union agents to solicit campaign contributions on school property during nonworking time.[11] As we stated *298 above, while the trial court found an inconsistency between section 7054's prohibition on the use of public resources for campaigning, and the allowance for the use of District furniture, heating, and electricity in connection with permitted political activities, we perceive no fatal inconsistency. Unlike respondents, we do not believe that "[t]he mailboxes stand in the same relation to the literature as does the chair the union agent may sit on while soliciting campaign funds during non-work' time."
As appellants observe, "[f]or the direct solicitation, the employee delivers the partisan political messagenot the chair he or she may sit on." In contrast to a chair, a school mailbox is specifically provided and designed to convey school-related information and material between teachers and staff. Moreover, there would be no violation of section 7054 if respondents were to leave copies of their newsletter on the same chair as the one used by the hypothetical union fundraiser.
We also find a distinction between an internal mailbox and a table in the teachers' lounge upon which, with the District's apparent agreement, the SLTA may leave its newsletters. Respondents argue that both objects are "passively used to hold literature that is produced by the union at its expense." The difference, however, is that mailboxes function as a conduit to deliver material to a specific reader, whereas tables are not primarily designed for or used as a means of communication. Moreover, as noted above, newsletters left in a teachers' lounge require the cooperation of the recipient in order to reach their intended destination, whereas newsletters placed in individual mailboxes do not.
Nor do we believe there is an inconsistency in the District's interpretation of section 7054 and the operation of section 7058. That section provides: "Nothing in this article shall prohibit the use of a forum under the control of the governing board of a school district or community college district if the forum is made available to all sides on an equitable basis." The fact that the Legislature has chosen to carve out an exception for public gatherings that could potentially include political advocacy on school grounds is consistent with the Civic Center Act (§ 38130 et seq.), which gives school districts the discretion to open school meeting facilities to members of the public.[12] While respondents contend that a literal reading of section 7054 would eviscerate the Civic Center Act, we are not persuaded. As respondents themselves acknowledge, unlike auditoriums, school mailboxes are not open to the public at large.

C. Relationship to the EERA
Respondents argue that appellants' interpretation of Education Code section 7054 is inconsistent the with EERA. Government Code section 3543.1, subdivision (b) provides: "Employee organizations shall have the right of access at reasonable times to areas in which employees work, the right to use institutional bulletin *299 boards, mailboxes, and other means of communication, subject to reasonable regulation, and the right to use institutional facilities at reasonable times for the purpose of meetings concerned with the exercise of the rights guaranteed by this chapter."
Appellants perceive no inconsistency, arguing that Education Code section 7054 is a "reasonable regulation" within the meaning of Government Code section 3543.1, subdivision (b). Additionally, they note that Government Code section 3540 provides that the EERA "shall not supersede other provisions of the Education Code." CSEA disagrees, arguing that "reasonable regulations" are limited to "time, place, or manner" regulations only, such as rules concerning the amount of material that could be placed in the mailboxes at one time.
The EERA does not define the term "reasonable regulation." Nor have the parties directed our attention to any cases construing that term. Our own research similarly has not uncovered a case on point. We therefore do not perceive a reason to construe the term in the limited manner suggested by CSEA.
We agree with appellants' position that limiting a school district's involvement in political activity serves a valid public purpose and is therefore "reasonable." Even respondents agree that section 7054 serves the legitimate purpose of insulating public money and services from political campaigns. As the California School Boards Association notes in its amicus brief, our Supreme Court has declared that it is "A fundamental precept of this nation's democratic electoral process ... that the government may not `take sides' in election contests or bestow an unfair advantage on one of several competing factions." (Stanson v. Mott (1976) 17 Cal.3d 206, 217, 130 Cal.Rptr. 697, 551 P.2d 1.) In the context of public education, it is proper for a school district to seek to disassociate itself with "`any position other than neutrality on matters of political controversy.'" (California Teachers Assn. v. Governing Board (1996) 45 Cal.App.4th 1383, 1388, 53 Cal.Rptr.2d 474, quoting Hazelwood School District v. Kuhlmeier (1988) 484 U.S. 260, 272, 108 S.Ct. 562, 570, 98 L.Ed.2d 592, 606.)
In sum, we find Education Code section 7054 serves the reasonable purpose of restricting access to internal school district mailboxes to nonpolitical uses. As such, it is a "reasonable regulation" within the meaning of Government Code section 3543.1, subdivision (b).

D. Incidental or Indirect Uses of Public Funds
Amici curiae American Federation of State, County and Municipal Employees, and Service Employees Union, Local 99 (Local 99) and the CSEA, direct our attention to League of Women Voters v. Countywide Crim. Justice Coordination Com. (1988) 203 Cal.App.3d 529, 250 Cal.Rptr. 161 (League of Women Voters) and Choice-in-Education League v. Los Angeles Unified School Dist. (1993) 17 Cal. App.4th 415, 21 Cal.Rptr.2d 303 (Choice in Education) for the proposition that where the primary purpose behind the expenditure of public funds is clearly unrelated to partisan campaigning, no violation occurs when a partisan political message is incidentally or indirectly aided in connection with the expenditure.
In League, of Women Voters, the court considered whether an impermissible expenditure of public funds occurred when a district attorney and a sheriff used their regularly assigned, county funded, drivers and security officers to transport them to meetings of a citizens' group that advocated passage of a ballot initiative. The court *300 observed that the officials "are on 24-hour duty and often must communicate with their offices, staff members or other public agencies at odd hours, including nights, weekends and holidays. The provision of county owned vehicles with special communications systems and county paid drivers also enhances efforts to ensure their individual security. Each elected official is authorized the 24-hour use of such vehicles and the use of peace officers as drivers or for other job-related purposes as they deem necessary." (203 Cal.App.3d 529, 556, 250 Cal.Rptr. 161.) The court concluded that "[g]iven the purpose underlying provision of the vehicles and drivers to the district attorney and sheriff and the breadth of their authority to utilize these tools, the nature of the activity to which they are driven in county owned vehicles logically has no bearing on the legitimacy of this expenditure of public funds." (Ibid.)
The issue in Choice in Education involved whether a school board that had a long-standing practice of televising its meetings violated the prohibition on expending public funds for a partisan cause when, during one such meeting, it adopted a resolution opposing an initiative set for an upcoming election. The complaining party did not contend the act of adopting the resolution was improper, but claimed that the school board engaged in political advocacy by televising its adoption of the resolution. The court concluded that "the `nature and timing' of the television broadcasts more reasonably supports the inference that the primary purpose of expending funds on such broadcasts was to provide greater public access to the Board's meetings rather than the inference that the primary purpose was to promote a partisan position on [the initiative]." (Choice-in-Education, supra, 17 Cal.App.4th 415, 430, 21 Cal.Rptr.2d 303.)
Appellants assert that these opinions are distinguishable because the resources at issue in both cases were not used as instrumentalities for partisan political campaigning. They stress that the vehicles at issue in League of Women Voters were used to transport the officials to their meetings, not to deliver a political message. Similarly, the television broadcast in Choice in Education was used to provide public access to school board meetings, not to campaign for a particular political initiative.
We agree with appellants that the use at issue here is not unrelated to the public resource that SLTA desires to use. The primary purpose of the internal mailbox system is to deliver messages to teachers and faculty. When such messages contain partisan political content, those messages are transmitted just as effectively as nonpolitical messages. Thus, we fail to see how such a use of this public resource can be deemed "indirect" or "incidental." Moreover, neither case cited by Local 99 involved a statute that explicitly prohibited the challenged use.[13] To adopt a rule that would permit political matter to be placed in mailboxes if it is only a nominal or incidental part of otherwise permissible information would lead to very subjective determinations and would be difficult to enforce.
Fundamentally, school district mailboxes are not simply receptacles designed to hold papers and envelopes. They are an integral part of an internal communication system designed to serve and enhance the *301 educational function of the school, analogous to a school's loudspeaker system. We do not believe it is reasonable to divorce the physical structure of the mailboxes from the overall purpose that is served by the District's internal mail delivery system. We also find no statutory inconsistency in the Legislature's apparent desire to limit the school district's involvement in partisan political activities to the extent those activities intrude on resources specifically intended to be used in furtherance of educational purposes.

III. Freedom of Speech
Having determined that SLTA's access to school district mailboxes for purposes of political advocacy is restricted by operation of section 7054, we must consider whether the District's policy violates respondents' right to freedom of speech under the California Constitution. Appellants assert that the prohibition on using school mailboxes for partisan political campaigning is constitutional. They maintain that internal faculty mailboxes are a nonpublic forum in which reasonable restrictions on speech are permissible. They also claim that even if the mailboxes have been opened as a limited public forum, the District may properly impose reasonable viewpoint-neutral restrictions.
In respondents' view, this case involves "content-based censorship that can be justified only by a compelling governmental interest." The trial court agreed, applying a strict scrutiny standard of review to the District's restrictions on SLTA's use of teacher mailboxes.
While the right to freedom of speech applies with some force on public school property, it is not unlimited: "The First Amendment's guarantee of free speech applies to teacher[s'] mailboxes as surely as it does elsewhere within the school, [citation], and on sidewalks outside, [citation]. But this is not to say that the First Amendment requires equivalent access to all parts of a school building in which some form of communicative activity occurs. `[N]owhere [have we] suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for ... unlimited expressive purposes.' [Citation.] The existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." (Perry Ed. Assn. v. Perry Local Educators' Assn. (1983) 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794.)
And while "[t]he right to criticize government administration, and to take positions on current political controversies, lies at the core of the First Amendment," (Bailey v. Loggins (1982) 32 Cal.3d 907, 921, fn. 10, 187 Cal.Rptr. 575, 654 P.2d 758), "[e]ven protected speech is not equally permissible in all places and at all times.... Accordingly, the extent to which the Government can control access depends on the nature of the relevant forum." (Cornelius v. NAACP Legal Defense & Ed. Fund (1985) 473 U.S. 788, 799-800, 105 S.Ct. 3439, 87 L.Ed.2d 567.)

A. California Constitution
Before we proceed with our analysis, we must address respondents' assertion that we are required to base our decision solely on cases construing the free speech clause of the California Constitution, article I, section 2, subdivision (a). Appellants assert that California courts have adopted the same forum analysis used by the federal courts when evaluating cases based on our Constitution. Respondents, on the other hand, contend that by advocating that we follow a federal forum analysis, *302 appellants are "ignoring the California Constitution."
Respondents based their writ petition solely on the California Constitution, omitting any reference to the First Amendment of the United States Constitution. Our state Constitution provides "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) The California Supreme Court "and the California Courts of Appeal, likewise have indicated that the California liberty of speech clause is broader and more protective than the free speech clause of the First Amendment." (Los Angeles Alliance for Survival v. City of Los Angeles (2000) 22 Cal.4th 352, 366, 93 Cal.Rptr.2d 1, 993 P.2d 334.)
Notwithstanding the broader reach of our state's free speech guaranty, it is apparent that our Supreme Court consistently looks to federal precedent in evaluating cases brought under the state provision. In the landmark decision of Robins v. Pruneyard Shopping Center (1979) 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341, our high court stated: "The duty of this court is to help determine what `liberty of speech' means in California. Federal principles are relevant but not conclusive so long as federal rights are protected." (Id. at p. 909, 153 Cal.Rptr. 854, 592 P.2d 341.)
More recently, our Supreme Court has stated: "The California free speech clause is broader and more protective than the First Amendment free speech clause. [Citation.] However, the fact that our provision is worded more expansively and has been interpreted as being more protective than the First Amendment in some respects does not mean that it is broader in all its applications. [Citation.] Generally, when we interpret a provision of the California Constitution that is similar to a provision of the federal Constitution, we will not depart from the United States Supreme Court's construction of the similar federal provision unless we are given cogent reasons to do so." (Edelstein v. City and County of San Francisco (2002) 29 Cal.4th 164, 168, 126 Cal.Rptr.2d 727, 56 P.3d 1029.)
While it is true that the California Constitution broadens the scope of freedom of speech in this state, we question whether we are compelled to bypass federal precedent interpreting the First Amendment of the federal Constitution. Almost all of the cases cited by respondents include discussions of federal law and adopt the same forum analysis as used in federal cases.
In arguing that we must look only to the state Constitution's liberty of speech clause, respondents rely primarily on U.C. Nuclear Weapons Labs Conversion Project v. Lawrence Livermore Laboratory (1984) 154 Cal.App.3d 1157, 201 Cal.Rptr. 837 (U.C.Weapons). The trial court in the present case cited this case for the proposition that "in interpreting the California Constitution's parallel free speech protections, the Court of Appeal has held that speech in a `semi-public' forum cannot be prohibited unless it is `basically incompatible' with the forum's primary purpose or normal activities."
In U.C. Weapons, the court held that the property used for a visitors' center operated by the Livermore laboratory must be made available to organizations opposed to the development of nuclear weapons. (154 Cal.App.3d 1157, 1169, 201 Cal.Rptr. 837.) The court recognized a flexible forum analysis, observing that public property exists in "a continuum, with public streets and parks at one end and government institutions like hospitals and prisons at the other. *303 [Citations.][[14]]" (Id. at p. 1164, 201 Cal.Rptr. 837.) The court determined that the visitors' center fell somewhere in the middle of this continuum, existing as a "semi-public" forum. (Id. at p. 1168, 201 Cal.Rptr. 837.) The court then applied a "`basic incompatibility'" test, finding that the lab's objectors had a right to access the property because their use was "compatible with the purpose and function of the Visitors' Center." (Id. at pp. 1164, 1169, 201 Cal.Rptr. 837.) Our research has not uncovered any subsequent California cases adopting this "basic incompatibility" test when analyzing the nature of a forum.[15]
Respondents also rely on Bailey, supra, a case in which the Supreme Court held that a prison newspaper was a limited public forum in which prison officials could not censor inmates' articles just because they "disapprove] of their beliefs or the content of their expression." (Bailey v. Loggins, supra, 32 Cal.3d 907, 915, 187 Cal.Rptr. 575, 654 P.2d 758.) The court relied, in part, on a state statute guaranteeing prisoners all civil rights except as necessary to provide for reasonable security of the institution. (Id. at pp. 914-915, 187 Cal.Rptr. 575, 654 P.2d 758.)
While respondents assert that the court in Bailey "rejected a strict forum analysis," the court frequently cited to federal authority (e.g., Bailey v. Loggins, supra, 32 Cal.3d 907, 917-918, 187 Cal.Rptr. 575, 654 P.2d 758) and determined that the forum in question was a "limited public forum," (id. at p. 919, 187 Cal.Rptr. 575, 654 P.2d 758) a term that is frequently used in federal cases. (See, e.g., Heffron v. Int'l Soc. for Krishna Consc. (1981) 452 U.S. 640, 655, 101 S.Ct. 2559, 69 L.Ed.2d 298.) We thus fail to see how this case supports respondents' assertion that federal law does not apply to analyses undertaken under our state's freedom of speech provision.
Respondents also cite to Wirta v. Alameda-Contra Costa Transit Dist. (1967) 68 Cal.2d 51, 64 Cal.Rptr. 430, 434 P.2d 982. In that case, the court held that a regulation allowing commercial advertising but banning political advertising was unconstitutional. We note that the Wirta opinion makes no reference to the California Constitution. While that fact is not enough to cause us to disregard its import as a decision of this state (see, e.g., Robins v. Pruneyard Shopping Center, supra, 23 Cal.3d 899, 908-910, 153 Cal.Rptr. 854, 592 P.2d 341 [analyzing California cases involving freedom of expression on private property] ) it does render Wirta somewhat less persuasive as a justification for departing from federal precedent in the area of freedom of speech. We also note that the holding of Wirta was subsequently contradicted by the United States Supreme Court in Lehman v. City of Shaker Heights (1974) 418 U.S. 298, 301, 94 S.Ct. 2714, 41 L.Ed.2d 770 (plur. opn. of Blackmun, J.). (But see Robins, supra, at p. *304 908, 153 Cal.Rptr. 854, 592 P.2d 341: ["The fact that those [state] opinions cited federal law that subsequently took a divergent course does not diminish their usefulness as precedent"].)
In contrast, several appellate courts have explicitly tied federal forum analysis to the California Constitution in deciding cases involving schools and freedom of expression. (See, e.g., Reeves v. Rocklin Unified School Dist. (2003) 109 Cal. App.4th 652, 661-663, 135 Cal.Rptr.2d 213 [holding that school campuses are not public forums]; DiLoreto v. Board of Education (1999) 74 Cal.App.4th 267, 281, 87 Cal.Rptr.2d 791 [holding a high school fence is a nonpublic forum]; Lopez v. Tulare Joint Union High School Dist. (1995) 34 Cal.App.4th 1302, 1328, 40 Cal.Rptr.2d 762 [holding a student film is a limited public forum]; and Leeb v. DeLong (1988) 198 Cal.App.3d 47, 56, 243 Cal.Rptr. 494 [holding a high school newspaper is a limited public forum].)
Furthermore, our courts have found federal cases to be particularly relevant in the context of educational institutions. In a case concerning the wearing of political buttons by teachers while on school property, the appellate court stated: "We also recognize article I, section 2 of the California Constitution provides independent protection for free speech which in certain contexts exceeds the protection provided by the First Amendment to the United States Constitution. [Citation.] Nonetheless, we find the federal authorities which discuss First Amendment principles in the fairly unique context of school regulation of curricular activities accurately weigh the competing interests of school administrators, teachers and students." (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th 1383, 1391, 53 Cal. Rptr.2d 474.)
In sum, we see no reason to depart from the federal forum analysis in analyzing this case under the California Constitution. Mindful that our constitutional guarantee of freedom of speech is broader than the federal provision, we nevertheless proceed to examine the issues of this case under federal precedent.

B. The Nature of the Forum

1. Applicable Analysis
As the scope of permissible regulations of speech varies depending on the nature of the forum, it is essential to determine which forum applies to this case. As our Supreme Court has noted, "For purposes of [a] forum analysis the high court has divided all public property into three categories. The first is the traditional public forumi.e., a place that by long tradition has been used by the public at large for the free exchange of ideas." (Clark v. Burleigh (1992) 4 Cal.4th 474, 482, 14 Cal. Rptr.2d 455, 841 P.2d 975.) Public streets and parks are prototypical public forums. (Id. at p. 482, 14 Cal.Rptr.2d 455, 841 P.2d 975.)
Regulations restricting speech in public forums must satisfy exacting tests in order to pass constitutional muster: "In these quintessential public forums, the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. [Citation.] The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 45, 103 S.Ct. 948.)
*305 "The second category of public property is the designated public forum, whether of a limited or unlimited characterproperty that the state has opened for expressive activity by part or all of the public."[16] (International Soc. for Krishna Consciousness, Inc. v. Lee (1992) 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541.) "The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. [Citations.] Although a State is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place, and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 45-46, 103 S.Ct. 948, fn. omitted.) Thus, regulations of expression in the context of a designated public forum must satisfy the same standards as those that apply in the context of a public forum.
"Finally, there is all remaining public property [citation], a category usually referred to as the `nonpublic forum.' 'Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.' [Citation.]" (Clark v. Burleigh, supra, 4 Cal.4th 474, 483, 14 Cal.Rptr.2d 455, 841 P.2d 975, fn. omitted.)
As the United States Supreme Court has explained: "Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the `First Amendment does not guarantee access to property simply because it is owned or controlled by the government.' [Citation.] In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. [Citation.] As we have stated on several occasions,'"`[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."" [Citations.]" (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 46, 103 S.Ct. 948.)

2. School Mailboxes are a Nonpublic Forum
Our Supreme Court has observed: "To apply the public forum doctrine a court proceeds in a series of steps. In step one the court defines the `forum' by deciding whether the forum is the entire property to which access is sought or only a portion of that property. In step two the court decides whether the forum thus defined is a traditional `public forum,' a `designated public forum,' or a `nonpublic forum.' If it is either of the first two kinds of forums, in step three the court decides whether the challenged law restricts the content of speech in that forum or only its time, place, or manner. And in step four the court tests the challenged law by the standard that governs both the class of forum *306 it has selected in step two, and if relevant, the type of speech restriction it has identified in step three." (Clark v. Burleigh, supra, 4 Cal.4th 474, 484, 14 Cal.Rptr.2d 455, 841 P.2d 975.)
Proceeding with step one, both sides agree that the forum is the internal school district mailboxes. As to step two, both sides agree that this forum is not a "traditional" public forum. They disagree, however, as to whether the forum is a "designated/limited public forum" or a "nonpublic forum." Relying on Perry, appellants argue that the mailboxes are a nonpublic forum.
The issue in Perry was whether it was constitutional for the school district to limit access to the school mailboxes to the union that represented district employees, thus denying access to a rival union that had previously been allowed to use the mailboxes. (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 39, 103 S.Ct. 948.) As the court stated: "The primary question presented is whether the First Amendment, applicable to the States by virtue of the Fourteenth Amendment, is violated when a union that has been elected by public school teachers as their exclusive bargaining representative is granted access to certain means of communication, while such access is denied to a rival union." (Perry, supra, at p. 44, 103 S.Ct. 948.) The high court disagreed with the rival union's position that "the school mail facilities have become a `limited public forum' from which it may not be excluded because of the periodic use of the system by private non-school-connected groups, and [the union's] own unrestricted access to the system prior to [the rival union's] certification as exclusive representative." (Id. at p. 47, 103 S.Ct. 948.) The court concluded that teacher mailboxes in a school district's interschool mail system were not a public forum, and that the district could therefore validly prevent unions other than the teachers' exclusive bargaining representative from using the system. (Id. at p. 46,103 S.Ct. 948.)
In the present case the trial court found that the District's mailboxes are a forum "that has been opened to SLTA by statute, by the terms of the collective bargaining agreement,[17] and by the conduct of the District. Thus as to this designated group, any restrictions by the District are subject to strict scrutiny." The trial court found that Perry did not apply, observing that the court in Perry itself had noted that "The very concept of the labor-management relationship requires that the representative union be free to express its independent view on matters within the scope of its representational duties." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 51, fn. 10, 103 S.Ct. 948.) The court thus limited Perry to its holding that the school district was justified in excluding the rival union from using the mailboxes while allowing the representative union such access.
We first observe that "'[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse.' [Citation.]" (Hazelwood School District v. Kuhlmeier, supra, 484 U.S. 260, 267, 108 S.Ct. 562.) In the present case, we do not believe that the Legislature or the District has created a designated public forum in *307 the District's mailboxes. This is not a case where "by policy or by practice" the District has "opened its mail system for indiscriminate use by the general public," in which case one could "justifiably argue a public forum has been created." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 47, 103 S.Ct. 948.) It is undisputed that the District only grants selective access to the mailboxes to outside interests. Moreover, the access granted by statute to SLTA is indistinguishable from the access accorded to the prevailing * union in Perry.
CSEA reiterates the trial court's rationale that Perry involved the issue of access to the forum based on speaker identity, rather than the content of the speaker's message. However, the court in Perry specifically stated that "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 49, 103 S.Ct. 948, italics added.) Our Supreme Court relied, in part, on Perry in holding that it was constitutional for the Legislature to limit the statements of candidates for office that are placed in voter pamphlets to a brief factual statement of the candidate's own background and qualifications. (Clark v. Burleigh, supra, 4 Cal.4th 474, 494-495, 14 Cal.Rptr.2d 455, 841 P.2d 975.) Thus, we read Perry to apply to restrictions based on content as well as speaker identity.
In arguing that the strict scrutiny test applies to the District's policy, respondents again rely on U.C. Weapons, as did the trial court. That case, however, is distinguishable. U.C. Weapons involved a visitors' center, which was "an enclosed place owned and operated by the government and open to the public at large." (U.C. Weapons, supra, 154 Cal.App.3d 1157, 1168, 201 Cal.Rptr. 837.) The court in U.C. Weapons did apply a forum analysis, albeit not a rigid one, and found that the center was akin to a public forum and that therefore it was not reasonable to prevent opposing views from having access to the property. Unlike the visitors' center in that case, however, the mailboxes at issue here are not generally open to the public. The District here did allow other organizations access to the mailboxes, but limited the materials to nonpolitical matters benefiting teachers. Thus, the mailboxes have not been converted from a nonpublic forum to a designated or limited public forum.
Respondents assert that, as to them, the forum is "closer to a designated, limited public form, than to an absolute nonpublic forum." In support of their claim, they note that the Legislature has required that mailboxes be made open to employee organizations by operation of Government Code section 3543.1, subdivision (b). They also analogize the mailboxes to the university property at issue in Widmar v. Vincent (1981) 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440.
In Widmar, the high court found a limited public forum where a university had opened a meeting space for student groups, but prevented a religious student group from using the space: "Through its policy of accommodating their meetings, the University has created a forum generally open for use by student groups. Having done so, the University has assumed an obligation to justify its discriminations and exclusions under applicable constitutional norms. The Constitution forbids a State to enforce certain exclusions from a forum generally open to the public, even if it was not required to create the forum in the first place." (Widmar v. Vincent, supra, 454 U.S. 263, 267-268, 102 S.Ct. 269, fn. omitted.) The court thereafter applied *308 a heightened standard of review to the university's regulations. (Id. at pp. 269-270, 102 S.Ct. 269.) As the District in the present case has not "created a forum generally open for use" in its mailboxes, we do not believe Widmar applies.
CSEA argues that the Legislature has opened the mailboxes to employee organizations without limitation as to topic under the EERA. Appellants counter that the EERA limits the scope of representation of an employee organization to "matters relating to wages, hours of employment, and other terms and conditions of employment." (Gov.Code, § 3543.2, subd. (a).) They assert that the EERA also provides that the primary purpose of an employee organization is "representing those employees in their relations with that public school employer." Thus, appellants assert that the right of a union to communicate to their members using the internal mailbox system is not entirely unlimited.
CSEA's contention appears to overstate the scope of the statutes allowing union access. Government Code section 3543.1, subdivision (b), allows employee organizations access to mailboxes and other means of communication "subject to reasonable regulation." We have already determined that Education Code section 7054 is one such "reasonable regulation." We further note PERB has already found that the EERA does not guarantee employee organizations the right to use the mailboxes to distribute political flyers. (Am. Fed. of Teachers Guild v. San Diego Community College Dist, supra, PERB Dec. No. LA-CE-4217-E [26 PERC ¶ 33014, p. 41].) Although the PERB decisions are not binding on this court, it has "exclusive jurisdiction" to determine whether a violation of Government Code section 3543.1, subdivision (b) has occurred. (Gov.Code, § 3541.5.) Thus its opinions are entitled to some deference: "PERB is vested with the exclusive jurisdiction to make an initial determination of a charge of unfair labor practices. [Citation.] `[W]hen an administrative agency is charged with enforcing a particular statute, its interpretation of the statute will be accorded great respect by the courts "and will be followed if not clearly erroneous. [Citations.]"' [Citations.]" (San Lorenzo Education Assn, v. Wilson (1982) 32 Cal.3d 841, 850, 187 Cal. Rptr. 432, 654 P.2d 202.)
The fact that the SLTA and a few other organizations (such as the PTA) have had access to the internal mailboxes does not convert the mailboxes into a public forum or even a limited public forum. The court in Perry observed that granting selective access to such outside organizations as the YMCA, Cub Scouts, and other civic and church organizations "does not transform government property into a public forum." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 46, 103 S.Ct. 948.) CSEA's view that the "intended purpose" of the mailboxes is to "serve as a means of communication between the union and the employees" goes too far. CSEA would place the union's use of mailboxes on equal or greater footing than the school district's use of the mailboxes for purely school-related activities. We do not believe that the EERA can be read so broadly.
Nor do we believe that the District's policy is contrary to cases that have upheld the rights of teachers to express their political views. The fundamental right of school employees to freedom of speech on school property is well established: "It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." (Tinker v. Des Moines School Dist. (1969) 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731, 737; see also LA Teachers Union v. *309 LA. City Bd. of Ed. (1969) 71 Cal.2d 551, 558, 78 Cal.Rptr. 723, 455 P.2d 827.)
We recognize that courts are more protective of the rights of teachers to express themselves when their speech is directed at each other, as opposed to their students. "[S]chool employees have the right to express to each other their respective political viewpoints on school property.... The relationship between coemployees has none of the elements of power and influence which exist between elementary and secondary school students and their instructors. Thus when teachers and other district employees express their political views to each other, there is very little risk their views will be unduly influential and thereby implicitly attributed to the school district." (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th 1383,1392, 53 Cal.Rptr.2d 474.)
Regulations affecting teachers' political activities, however, are not per se invalid. As one court in a different context observed: "District's goal in regulating the political activities of its employees is fairly straightforward. According to district's circular, it does not wish to become involved in sponsoring or subsidizing political activities. Moreover, district has attempted to achieve its goal in a fairly uncomplicated fashion: it has banned [the wearing of campaign buttons] by its employees while they are working. In the end, our analysis respecting the district's limitation is also fairly straightforward and uncomplicated: the ban may be enforced in instructional settings and it may not be enforced in noninstructional settings." (California Teachers Assn. v. Governing Board, supra, 45 Cal.App.4th 1383, 1393, 53 Cal.Rptr.2d 474.)

3. The District's Policy is Reasonable and Viewpoint Neutral
Regulations restricting speech in a nonpublic forum survive constitutional scrutiny if they are reasonable and viewpoint neutral. (Cornelius v. NAACP Legal Defense & Ed. Fund, supra, 473 U.S. 788, 806, 105 S.Ct. 3439.) Contrary to respondent's characterization, this test does not mean that "the government can do what it wishes with the speech that takes place [in the forum]." "When a forum is nonpublic, we review government-imposed restrictions under a reasonableness standard. `The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation.' [Citation.] But the government may not 'restrict speech in whatever way it likes.' [Citation.] Such restrictions cannot `be based on the speaker's viewpoint and must otherwise be reasonable in light of the purpose of the property.' [Citation.]" (Currier v. Potter (9th Cir.2004) 379 F.3d 716, 730.)
Content-based restrictions are not subject to heightened scrutiny in the context of a nonpublic forum. "Implicit in the concept of the nonpublic forum is the right to make distinctions in access on the basis of subject matter and speaker identity. These distinctions may be impermissible in a public forum but are inherent and inescapable in the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property. The touchstone for evaluating these distinctions is whether they are reasonable in light of the purpose which the forum at issue serves." (Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 49, 103 S.Ct. 948.)
CSEA contends that the District has violated the union's and employees' free speech rights under any forum analysis. We disagree. We have already concluded in our discussion of section 7054 that it is reasonable to limit a school district's involvement *310 in partisan politics, thereby preserving its resources for educational purposes and avoiding the appearance of political favoritism. And, as the District's mailbox policy restricts all political campaigning, regardless of whether the speech favors or disfavors any particular candidate or ballot measure, it is clearly viewpoint neutral.
The District's limitation also leaves ample alternative channels for communication by which SLTA may engage in political activities, including leaving material in the faculty lounge, engaging in solicitation during nonwork hours, and mailing newsletters to the employees' home addresses. The existence of alternative channels is further evidence of the reasonableness of a speech restriction. (See Perry Ed. Assn. v. Perry Local Educators' Assn., supra, 460 U.S. 37, 53, 103 S.Ct. 948["[T]he reasonableness of the limitations on [the union's] access to the school mail system is also supported by the substantial alternative channels that remain open for union-teacher communication to take place"].) District employees thus remain free to engage in partisan political activities as long as those activities are not conducted using taxpayer funded public resources.

4. Similar Cases in Other Jurisdictions
While we have not found, nor have the parties directed us to, any California cases directly on point, fact patterns similar to the undisputed facts before us have been discussed in other jurisdictions. In Education Minn. Lakeville v. Independent School (D.Minn.2004) 341 F.Supp.2d 1070, the court addressed a school district policy that restricted the union from placing political materials in teacher mailboxes. The policy provided: "No literature endorsing any political candidate or other similar political materials shall be distributed in employee mailboxes or in the school district's internal mail systems." (Id. at p. 1072.) A teachers' union sought a preliminary injunction on the grounds that the policy impermissibly prevented it from distributing literature supporting presidential candidate John Kerry. The court denied the request, finding that the plaintiffs were unlikely to succeed on the merits as the mailboxes were a nonpublic forum and the regulation was a permissible content-neutral regulation. (Id. at p. 1080.)
The court first determined, following Perry, that the mailboxes and internal mail facilities were nonpublic fora. (Education Minn. Lakeville v. Independent School, supra, 341 F.Supp.2d 1070, 1075.) The court then proceeded to apply a reasonableness test to the regulations, finding that the policy was permissible because it did not deny access on the basis of the union's viewpoint, served the district's legitimate interest in preserving the property for school-related purposes, and allowed for substantial alternative channels of communication between teachers and their union. (Id. at p. 1076.) Such alternative channels included direct mail, the union's Internet website, and in-person solicitation. (Ibid.)
In a case arising out of the state of Washington involving a statute similar to section 7054, the appellate court considered "a hypothetical example of a union newsletter that contained nonpolitical messages, but could not be delivered by a school employee to teacher mailboxes because it also contained political messages." (Herbert v. Washington State Public Disclosure Commission (2006) 136 Wash.App. 249, 267, 148 P.3d 1102.) The court observed: "[T]he goal of the statute is to prohibit public employees from using public resources to distribute political messages; the speech itself could be distributed by another means (such as the United States Postal Service). Thus, the* speech *311 itself is not chilled by the statute, but only the use of the public facilities by public employees to deliver that speech. The statute as applied carefully delineates speech that uses public facilities and all other types of speech." (Id. at p. 267, 148 P.3d 1102.)
The court further stated: "While it is true that [appellant's] hypothetical union newsletter containing both political and nonpolitical messages could not be delivered by a school employee through the internal mailbox system, nothing prohibits the union from separating the messages. A union newsletter containing nonpolitical messages could still be distributed through internal mail, while political messages could be distributed via, for example, United States mail or in a staff room during nonwork hours." (Herbert v. Washington State Public Disclosure Commission, supra, 136 Wash.App. 249, 267-268, 148 P.3d 1102.)
We believe the hypothetical solution outlined by the court above supports the conclusion that the District's policy does not unduly impinge on SLTA's rights. While the policy renders communication with employees regarding political campaigns somewhat less convenient from the SLTA's standpoint, "[t]he First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." (Cornelius v. NAACP Legal Defense & Ed. Fund supra, 473 U.S. 788, 809,105 S.Ct. 3439.)

IV. Award of Attorney Fees
Since we have reversed the trial court's writ order, the order awarding attorney fees under Code of Civil Procedure section 1021.5 must be vacated because that statute allows for an award of attorney fees to a successful party only.[18] "[W]here an appellate court reverses a judgment ordering issuance of a writ of mandate, `[i]t follows' that the trial court's section 1021.5 attorney fees award must also be reversed. [Citations.]" (National Parks & Conservation Assn. v. County of Riverside (2000) 81 Cal.App.4th 234, 238, 96 Cal.Rptr.2d 576.)

DISPOSITION
Because the internal school mailbox system is a nonpublic forum and the District's restrictions on its use are reasonable and viewpoint neutral, we conclude that the District's policy is constitutional: We therefore reverse the trial court's order and reverse the order awarding attorney fees.
We concur: STEIN, Acting P.J., and MARGULIES, J.
NOTES
[1] The appeals are consolidated.
[2] The following paragraph is found under the heading "School Board Election": "The campaign to help elect the SLTA endorsed candidates (John Franke and Stephen Cassidy) is building momentum. More than 75 SLTA members have actually worked on the campaign alreadyhanding out literature at back-to-school nights, phone banking or walking precincts. The STAND `Meet the Candidates' event was a tremendous successit attracted many SLTA members as well as Trustee Rick Richards, Assemblywomen [sic] Ellen Corbett, [and] former Mayor Jack Maltester, and raised over $4000 for the campaign. Please volunteer now! Time is criticalyour help may make the difference. We can have a more teacher friendly school board and administration. Talk to your site rep or call 614-2303."
[3] The "From the Table" memorandum discusses various issues pertaining to employee relations, such as salaries, benefits, and evaluations. Near the bottom of the page it states: "Support your Bargaining Team's efforts to improve your salaries and working conditions! Please volunteer to phone or walk in support of our endorsed School Board Candidates." The memorandum does not mention the candidates by name.
[4] All further references to codes are to the Education Code, unless otherwise indicated.
[5] Section 7054, subdivision (a), provides: "No school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district."
[6] SLTA had placed political endorsements in school mailboxes in 2000 and in 2002. According to Mr. Martinez, the District was not aware that SLTA was distributing such materials prior to 2004.
[7] Appellants also asserted respondents failed to exhaust the collective bargaining agreement's grievance procedures before filing suit. They do not challenge the trial court's adverse ruling on this ground.
[8] The Legislature evidently takes this matter seriously, as violations of section 7054 are subject to criminal sanctions. (§ 7054, subd. (c).)
[9] In support of its argument that section 7054 applies even to "nominal" uses, amicus curiae California School Boards Association contrasts the language of this section with that found in Government Code section 8314, subdivision (b)(4), which limits the prohibited "use" of public resources to the "use of public resources which is substantial enough to result in a gain or advantage to the user or a loss to the state or any local agency for which a monetary value may be estimated."
[10] Respondents also rely on two letters from assistant district attorneys who declined in 2005 to prosecute third parties that allegedly sent messages containing political endorsements to teachers' work e-mail addresses. Such letters are of no precedential value in this court.
[11] Section 7056 provides:

"(a) Nothing in this article prevents an officer or employee of a local agency from soliciting or receiving political funds or contributions to promote the support or defeat a ballot measure that would affect the rate of pay, hours of work, retirement, civil service, or other working conditions of officers or employees of the local agency. These activities are prohibited during working hours. In addition, entry into buildings and grounds under the control of a local agency for such purposes during working hours is also prohibited.
"(b) Nothing in this section shall be construed to prohibit any recognized employee organization or its officers, agents, and representatives from soliciting or receiving political funds or contributions from employee members to promote the support or defeat of any ballot measure on school district property or community college district property during nonworking time. As used in this subdivision, `nonworking time' means time outside an employee's working hours, whether before or after school or during the employee's luncheon period or other scheduled work intermittency during the schoolday."
[12] The Civic Center Act provides that school boards "may grant the use of school facilities or grounds as a civic center upon the terms and conditions the board deems proper ...." (§ 38131, subd. (b).)
[13] We decline Local 99's invitation to construe section 7054 in light of these two cases on the grounds that the statute was amended after these cases were decided. As neither case involved section 7054, we have no basis upon which to conclude that the cases played any part in the Legislature's decision to amend the statute.
[14] All but one of the citations are to federal cases relating to First Amendment issues.
[15] We note that the "basically incompatible" language is utilized in federal cases in the context of deciding whether a given regulation constitutes a reasonable time, place, and manner restriction: "The nature of a place, 'the pattern of its normal activities, dictate the kinds of regulations of time, place, and manner that are reasonable.' Although a silent vigil may not unduly interfere with a public library, [citation], making a speech in the reading room almost certainly would. That same speech should be perfectly appropriate in a park. The crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." (Grayned v. City of Rockford (1972) 408 U.S. 104, 116, 92 S.Ct. 2294, 33 L.Ed.2d 222, italics added, fn. omitted.)
[16] Our Supreme Court has observed, "there are few examples of designated public forums in Supreme Court jurisprudence because the court has rarely ... placed any property in this category." (Clark v. Burleigh, supra, 4 Cal.4th 474, 483, 14 Cal.Rptr.2d 455, 841 P.2d 975.)
[17] The collective bargaining agreement provides, in part: "The Association shall have the right to post notices of Association business. The Association may use teacher mailboxes and communications for lawful communications to teachers. Such postings or items for school mailboxes must contain the date of posting or distribution and the identification of the Association."
[18] Code of Civil Procedure section 1021.5 provides, in part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."